IN RE SEARSPORT WATER COMPANY.

IN RE LINCOLN WATER COMPANY.

Penobscot.   Opinion December 9, 1919.

*General scope of authority of Public Utilities Commission.*

The control and regulation by the State of the rates of public utilities is a legislative or governmental function and a legitimate exercise of the police powers of the State.

When one devotes his property to a use in which the public has an interest, he must submit to be controlled by the public for the common good to the extent of the public interest he has created.

The public interest in the rates charged for the public service rendered by a Public Utility Company does not cease at the point when the operating expenses of the company is insured, and begin again when the rates result in more than a fair return, or exceed the value of the service rendered.   So long as the property is devoted to the public use the State may control the rates at all times.   The public cannot be assured of adequate service except upon the basis of a fair return upon a fair value of the property devoted to the public use; the rates in no case, however, to exceed the value of the service rendered.

While all contracts by municipalities or by individuals with a Utility Company for any service are presumed to be entered into with the understanding that the State may at any time regulate the service and the rates to be charged therefor, the State may by appropriate legislation suspend its authority to exercise its power of regulation, and authorize a municipality to enter into an inviolable contract with a utility company for a reasonable period fixing the rates to be charged by such utility for the public service, which contract will be protected against impairment under the Federal and State Constitutions.

The surrender by the State of this important governmental function, however, must be in terms so clear and unequivocal as to admit of no doubt of the intent to surrender.   General authority to contract is not sufficient.   Express terms are required.   All doubts must be resolved in favor of the State.

In the cases at bar no such clear and unmistakable intent to surrender this important function of government is found in the Charter of either of the Water Companies, or in Sec. 63, Chap. 4, R. S.

Unless such surrender is made, the rates for any public service such as the supplying of water or other utility for public or domestic uses are just as fully subject to regulation by the State under its police powers,when fixed by mutual consent in a contract, as when summarily determined by the Utility Company itself.

All contracts relating to the public service must be understood as made in contemplation of the possible exercise at any time by the State of this legitimate governmental power.   The duty, once undertaken, to serve the public in a reasonable manner cannot be avoided by a contract.

The general purpose of Chap. 55, R. S., known as the Public Utilities Act, was to place the entire regulation and control of all public service companies in the hands of the Utilities Commission, which is authorized to inquire into the management of *all* public utilities within the State, and whenever *any* rate, toll or charge is found after hearing to be "unjust, unreasonable or insufficient" to substitute therefor just and reasonable rates.

The language of the Act is broad enough to include the control and regulation of eevry rate, toll or chaige whether fixed by contract or determined by the Utility Company itself.

Such construction does not give the Act a retroactive effect.   All existing contracts relating to the public service remain valid, binding obligations unaffected in their terms, and being voluntarily entered into between the articles, the rates fixed therein are presumed to be reasonable and just, until otherwise determined after hearing, when just and reasonable rates may then be substituted therefor.

No vested rights under such contracts are affected by the Act, as none can be gained against the proper exercise of the police powers of the State.

The power was in the State prior to the enactment of this legislation to require any utility over which the State had not surrendered its regulatory powers to furnish the public service in which it was engaged at just and reasonable rates notwithstanding any contract it may have entered into.   No new duties or disabilities, therefore, were imposed on any public utility by the terms of Chap. 55, R. S.   And when the Utilities Commission acts, it acts after hearing, and for the future.

There is no implication from the fact of all contracts granting undue preferences or advantage entered into prior to January 1st, 1913, being exempted from the provisions of Secs. 33 and 34, that all other existing contracts are excepted from the operation of the Act.   Quite the contrary.   If any inference follows from the exception of existing discriminatory contracts from the effects of Secs. 33 and 34, which are penal sections, it is rather that all other existing contracts are included within the general terms of the Act, unless expressly-excepted.

From the general purpose of such legislation and by reason of the broad and inclusive terms employed in Chapter 55 in conferring powers on the Utilities Commission and in the light of the Judicial construction of similar Acts by

other courts of last resort it is held, that the Legislature, unless otherwise expressly stating, or it following by necessary implication, intended to delegate to the Utilities Commission as full and complete power of regulation of rates of public utility companies as the State itself then possessed.

The Utilities Commission having determined after hearing that the rates, tolls or charges of any Utility Company whether fixed by the company itself or by contract, are in fact unjust and unreasonable, we must assume in the absence of exceptions to any ruling of law in connection with such finding, that it has so determined upon considerations that affect the public interest. Upon this point the conclusions of the Utilities Commission in the cases at bar must be treated as findings of fact properly determined.

The rates charged by the Searsport and Lincoln Water Companies under their respective contracts with the towns of Searsport and Lincoln having been determined to be unjust, unreasonable and insufficient, and the State not having surrendered its regulatory power over either of these companies, the Utilities Commission had authority to order just and reasonable rates substituted therefor for both the public and domestic service.

Exceptions under R. S., Chap. 55, Sec. 55, from the ruling and findings of Public Utilities Commission. Judgment in accordance with opinion.

Case stated in opinion.

*A. S. Littlefield, and G. W. Thombs,* for Town of Searsport and Town of Lincoln.

*Andrews & Nelson,* for Searsport Water Company and Lincoln Water Company.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, WILSON, DEASY, JJ.

WILSON, J. Under special Acts of the Legislature the Searsport Water Company and the Lincoln Water Company were organized to supply the respective towns of Searsport and Lincoln with "water for domestic, sanitary and municipal purposes," each company being expressly authorized to enter into a contract with the town in which it was located to supply it with water for municipal or public uses.

While the language of the respective charters differs in this respect, there can be no doubt of the authority of each company to contract with any corporation or individual in the town in which it was located to supply water for domestic, sanitary or industrial uses. No provision is found in either charter, however, in terms authorizing either town to contract with the Water Company for water for its

inhabitants for domestic uses, or to fix or regulate the rates at which it should be supplied to them.

In 1905 the town of Searsport entered into a contract with the Searsport Water Company, and in 1911 the town of Lincoln entered into a contract with the Lincoln Water Company whereby the respective Water Companies were to construct reservoirs, lay mains, and furnish to the town, water for municipal and fire purposes for a stipulated sum per annum, and also to furnish to the inhabitants of the town, water for domestic and sanitary purposes at a fixed rate or price.

Both contracts were still in force in 1918 when each Water Company filed a new schedule of rates both municipal and private with the Public Utilities Commission under Chap. 55, R. S., known as the Public Utilities Law, by which schedules the rates of each Water Company both for public and private service were increased over those fixed in the contracts with the respective towns. Complaints were filed with the Public Utilities Commission by each town and certain of its inhabitants against the increased rates. A hearing was held. The Commission adjudged the rates both for public and private service as fixed in the respective contracts to be "unjust, unreasonable, and unjustly discriminatory," and ruled as a matter of law that it had authority to change the rates even though fixed by contract and found the rates for private service as fixed in the new schedules of each company to be just and reasonable, but fixed lower rates for the public service in each case than those set forth in the respective schedules filed, though in excess of the rates stipulated in the contracts.

To the ruling of the Commission that it had authority to order new rates substituted for those contained in the contracts, each town and certain of its inhabitants as users of the private service excepted. Both cases come before this court on the exceptions. As the same questions are involved in each case and they were argued together, they are considered in one opinion by this court.

While this court in the recent case of In Re Guilford Water Co., 118 Maine,—laid down certain principles that are, we think, decisive of the issues in the instant cases so far as the rates for the private service are concerned, contentions not raised in that case have been urged by counsel in the cases now at bar, which require a restatement of the principles we deem controlling in this class of cases. In the cases now before us a valid contract for public uses entered into by

legislative authority existed between each town and the utility supplying it, which did not exist in the Guilford case, and which presents questions that require full consideration.

The complainants here contend: (1) that, although contracts harmful to the public health, safety or morals may be subject to regulation at all times under the police powers of the State, the evidence in these cases disclosed that the contracts in question were innocuous so far as the public health or safety is concerned, and that inasmuch as the changes in rates authorized by the Utilities Commission only affected the amount of the stockholders' return, it therefore does not concern the public, and the public interest ceasing to exist, the State's control under its police powers ceases; (2) that when the public health, safety or morals are not involved, the State may authorize a municipality to enter into an inviolable contract fixing the rates for service for a term of years with any public utility, and that the contracts in the instant cases are of that nature; (3) that the supplying of water to a municipality and its inhabitants is a proprietary matter and any contract by the municipality relating thereto is protected against impairment by the State and Federal constitutions; (4) and that finally irrespective of the power of control vested in the State, the Legislature did not under Chap. 55, R. S., delegate to the Public Utilities Commission the authority to regulate rates established by a contract entered into prior to its enactment.

The questions raised here are not new and have in some form been many times considered by both State and Federal Courts, and more recently of necessity by Public Service Commissions in the different states. The decisions taken as a whole, however, can not be said to have contributed to clarity, but rather to obscurity of view as to the stature and scope of the police powers, particularly in their application to the regulation of rates where contracts fixing them have been entered into under legislative authority.

In a recent case before it, *Clifton Forge* v. *Virginia Western Power Co.*, P. U. R., 1918, F. 791, 803, the Corporation Commission of Virginia commented on the seeming inconsistencies in the conclusions of some of the decided cases in the Federal Supreme Court, citing *Cleveland* v. *Cleveland City Ry. Co.*, 194 U. S., 517 and *Home Tel. & Tel. Co.* v. *Los Angeles*, 211 U. S., 265; and of which *Freeport Water Co.* v. *Freeport City*, 180 U. S., 587, and *Vicksburg* v. *Vicksburg Water Works Co.*, 206 U. S., 496 are perhaps, even more conspicuous examples.

An analysis of these and the many other decisions in the Federal and State Courts in which these questions have been considered discloses that many of the seeming inconsistencies are more apparent than real; and in the Federal Court at least are the result of having followed the construction by the State Courts of the statutes involved. See *Home Tel. & Tel. Co.* v. *Los Angeles, supra,* page 277. *Milwaukee Ry. Co.* v. *Wisconsin R. R. Com.,* 238 U. S., 174, 182. However, neither the conclusions nor the reasoning can be said to be harmonious in all the decisions.

Certain principles are no longer questioned. The control or regulation of rates by public utilities is a legislative or governmental function and a legitimate exercise of the police powers of the state. *Munn* v. *Illinois,* 94 U. S., 113. *Minnesota Rate Cases,* 230 U. S., 352, 413-415, 433. *Kennebec Water Dist.* v. *Waterville,* 97 Maine, 185, 201. Where the public health, safety or morals are concerned the power of the State to control under its police powers is supreme and cannot be bargained or granted away by the Legislature. The exercise of the police power in such cases violates no constitutional guarantee against the impairment of vested rights or contracts. *Fertilizing Co.* v. *Hyde Park,* 97 U. S., 659. *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S., 746, 751. *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115, U. S., 650, 672. *New Orleans Water Works* v. *Rivers,* 115, U. S., 674. *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S., 1, 15. *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S., 548. *Dirken* v. *Great Northern Paper Co.,* 110 Maine, 374, 388. *State* v. *Mayo,* 106 Maine, 62, 66.

The power to regulate the rates of public utilities, however, is not dependent on the immediate concern of the public health or safety therein.

"When one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use and must submit to be controlled by the public for the common good to the extent of the interest he has created."

*Munn* v. *Illinois, supra,* page 126. *Union Dry Goods Co.* v. *Ga. Pub. Ser. Corp.,* 248 U. S., 372, 375. *Woodburn* v. *Pub. Ser. Com.,* 82 Or., 114, 120. *Boston and Maine R. R. Co.* v. *County Commissioners,* 79 Maine, 386.

The State requires every public utility to "furnish safe, reasonable and adequate facilities" and its rates and charges to be reasonable and

just, based upon a fair return on the fair value of the property devoted to the public use.. Sec. 16, Chap. 55, R. S. Its power to do so cannot be questioned. To assume that a Public Utilities Commission will in any case order the rates of a utility increased upon the sole consideration of increasing the returns of stockholders appears to us like begging the question. The public interest does not cease at the point where the rates ensure merely the operating expenses of the company and begin again when they result in more than a "fair return" or exceed the value of the service rendered. The continued existence of the utility and the performance of its public obligations cannot be maintained on this basis. So long as the property is devoted to the public use the State may control the rates at all times, as well when they are unfair to the utility because of failure to produce a "fair return," as when they are ;unfair to the public because too high. *Winfield* v. *Public Ser. Com.*, Ind., P. U. R., 1918, B. 747, 752. *Collingswood Sew. Co.* v. *Collingswood*, (N. J.), P. U. R., 1918, C. 261, 268. The whole theory of rate regulation by the State is based on these principles.

Thus far we have considered the general powers of the State where no contract fixing the rates exists. In what respect may these powers be controlled by contracts between municipalities or the individual consumer and the utility?

Where the public health, morals or safety is involved the power to control vested rights whether obtained by contract or otherwise, must prevail. All must yield in these respects to the common welfare. *Fertilizer Co.* v. *Hyde Park*, 97 U. S., 659. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S., 650. *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S., 1, 15.

The Utilities Commission, however, having based its orders in these cases upon the fact that the rates fixed by the contracts with the respective towns were unjust and unreasonable, and not having found that the public health or safety was jeopardized, the supreme necessity for the exercise of the police powers does not appear to exist. We must, therefore, inquire into that broader field of police powers, outlined in *B. & M. R. R.* v, *County Commissioners*, 79 Maine, 386, 395, beyond the immediate concern of the public-health, morals or safety, and determine under what conditions, if any, contracts may preclude the State from the full exercise of its powers of rate regulation.

It is frequently laid down in the books that the exercise of the police powers is a governmental function, continuing in its existence, and cannot be granted or bargained away. *Stone* v. *Mississippi*, 101 U. S., 814, 817.    *Texas No. R. R. Co.* v. *Miller*, 221 U. S., 408. *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S., 548.    *Dirken* v. *Great Northern Paper Co.*, 110 Maine, 374, 388.   The power of rate making being recognized as an exercise of the police powers and a legislative or governmental function, we might in all cases, on principle, expect it to remain vested in the State.   This we apprehend has been the view of some of the State Courts.    *Danville* v. *Danville Water Co.*, 178 Ill., 299.    *Yeatman* v. *Public Service Com.*, 126 Md., 513.

However, the Federal Supreme Court which finally determines when contracts have been impaired, has adopted the view, which now appears to be generally accepted by the State Courts, and which we feel constrained to follow, that the state may in its discretion vest in one of its municipalities the authority to enter into an inviolable contract for a reasonable period regulating the rates to be charged by a public utility for its service.   That in this respect, at least, it may suspend its authority during the life of such contract to exercise this important governmental function, and that such a contract is protected against impairment by the State under Sec. 10, Art. 1 of the Federal Constitution.    *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S., 1.    *Los Angeles* v. *Los Angeles Water Co.*, 177 U. S., 558. *Freeport* v. *Freeport City Water Co.*, 180 U. S., 587.    *Vicksburg* v. *Vicksburg Water Works Co.*, 206 U. S., 496, 508.    *Home Tel. & Tel. Co.* v. *Los Angeles, supra.*    *Milwaukee* v. *Wisconsin R. R. Com.*, 238 U. S., 174, 180.    *Winfield* v. *Public Ser. Com.*, (Ind.), P. U. R., 1918, B. 747.    *Benwood* v. *West Va. Public Service Com.*, 75 W. Va., 127.

This view is concisely stated in *Milwaukee* v. *Wisconsin R. R. Com.*, *supra*, page 180.

"The fixing of rates which may be charged by public service corporations of the character here involved is a legislative function of the state, and while the right to make contracts which shall prevent the state during a given period from exercising this important function has been recognized and approved by judicial decisions, it has uniformly been held in this Court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction."

Franchise contracts, so-called, and contracts for the supply of water or other utility to a municipality in which the rates are fixed for the public service rendered are valid and binding between the parties. *Detroit* v. *Detroit Citizen Ry.*, 184 U. S., 368. *Cleveland* v. *Cleveland City Ry. Co.*, 194 U. S., 517. *Minneapolis* v. *Minneapolis St. Ry. Co.*, 215 U. S., 417. In the last cited cases, however, and in the case of *Columbus Ry. P. & Lt. Co.* v. *Columbus*, 249 U. S., P. U. R., 1919, D. 239, referred to in the complainant's brief, the authority of the State to control under the police powers was not in question.

The supplying of water to a municipality and its inhabitants is without doubt a proprietary matter, as is also the fixing by contract the price at which it is to be supplied; but a distinction exists, we think, between fixing such price by mutual consent in a contract, and the summary control under the police powers of rates and charges for performing a public service. One is a proprietary matter, the other a governmental function. The right to make a contract concerning a proprietary matter constitutes no authority to perform a governmental function. Prices fixed by agreement, and rates and tolls determined by a fair return on the fair value of the property devoted to the public use, are based on different considerations. *Woodburn* v. *Pub. Ser. Com.*, 82 Or., 114. *Traverse City* v. *Mich. R. R. Com.*, P. U. R., 1918, F. 752, 760, 761. To preclude the State from the exercise of this power the surrender must be so clear and unequivocal as to permit of no doubt of the legislative intent. All doubts should be resolved in favor of the continuance of the power. General authority is not sufficient; special authority is required. *Home Tel. & Tel. Co.* v. *Los Angeles, supra*, page 273. *Englewood* v. *So. Platte Ry. Co.*, 248 U. S., 294.

To apply these principles to the instant cases, we find no such clear and unmistakable surrender of this important function of government in the charter of either of the Water Companies, or in Sec. 63, Chap. 4, R. S.

By its charter each company was authorized to contract with corporations, the inhabitants of said towns and village corporations located therein for supplying water as contemplated by the Act. Under Sec. 63, Chap. 4, R. S., each town, and the town of Searsport under the charter of the Searsport Water Company, was authorized to enter into a contract for the supply of water for public uses upon such terms and conditions as the parties may agree. The fixing or regula-

tion of charges by contract is nowhere mentioned in either charter. Nothing, we think, can be implied except the proprietary right of determining by agreement the compensation to be received by the Companies for the supply of water furnished.

These grants, in such general terms, of the right to contract should not be construed as a surrender of an important function of government. All doubts must be resolved in favor of the retention of this power in the State. Complainants contend that similar language in the case of *Vicksburg* v. *Vicksburg Water Works Co.*, 206 U. S., 496, was held to authorize the city to enter into an inviolable contract as to rates. True, but in *Freeport Water Co.* v. *Freeport City*, 180 U. S., 587, and in *Home Tel. & Tel. Co.* v. *Los Angeles, supra*, much stronger language was construed against such a grant. The Federal Court followed the construction of the State Courts in each case. The majority of the State Courts will be found to construe such statutes strictly and in favor of the State. Such contracts may bind the parties, but as against the State they must be regarded as entered into in contemplation of the State's authority to regulate all rates for the public service. Such regulation does not constitute an impairment of contracts within the meaning of the constitution. As said in *Knox* v. *Lee*, 12 Wall., 457, 550: "Contracts must be understood as made in reference to the possible exercise of the rightful authority of government, and no obligation of a contract can extend to defeat legitimate government authority."

*Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S., 467, 482. *Union Dry Goods Co.* v. *Ga. Public Service Corp.*, 248 U. S., 372.

Having concluded that the State has not surrendered its regulatory powers in the cases at bar, it is unnecessary to determine the limits within which the public health, safety or morals are concerned to such an extent as to preclude the Legislature from surrendering or suspending this important function of government; nor to invoke any doctrine of waiver or reclaiming of authority, in the support of which *Worcester* v. *Worcester St. Ry.*, 196 U. S., 539, *Collingswood Sewage Co.* v. *Borough of Collingswood*, 92 N. J., L. 509; *Borough of No. Wildwood* v. *Bd. of Pub. Util. Com.*, 88 N. J. L., 81, *Arlington Bd. of Survey* v. *Bay St. Ry.*, 224 Mass., 463, 471 are cited. Such doctrine, however, only applies to governmental or public and not to proprietary obligations. Nor do we deem it necessary to consider separately the status of the individual taker under these contracts Considering them as

having some enforceable rights in contract under the views expressed in *Robbins* v. *Railway Co.*, 100 Maine, 496, they are entitled to no greater protection than the municipality under its contract. In neither case does the language of the acts warrant our construing it as a surrender of the state control.

Thus far we have considered the complainants' contentions as between them and the State. We now come to the question of whether the State, even though it retained this power in respect to these complainants, has vested it in the Public Utilities Commission under Chap. 55, R. S. The general purpose of legislation of this nature, which has been enacted in many of the States, is, we think, to place the entire regulation and control of all public service corporations (or individuals engaged in supplying a public utility) in the hands of a Board or Commission which can investigate conditions, hear parties, and grant relief much more expeditiously and fairly than the Legislature itself. *Benwood* v. *Pub. Ser. Com.*, 75 W. Va., 127, 129.

By the Act the Utilities Commission is expressly authorized to inquire into the management of the business of *all* public utilities which are by its express terms made subject to the jurisdiction, control and regulation of the Commission. *Every* unjust and unreasonable charge for such service is prohibited. Whenever, upon hearing, *any* rate, toll, charge or schedule or joint rates are found to be unjust, unreasonable, insufficient, or unjustly discriminatory, or otherwise in violation of the Act, the Commission is given full power to substitute therefor such rates, toll, charges or schedules as may be just and reasonable.

Such language is clearly broad enough to include the regulation and control of every rate, toll, charge or schedule of every public utility whether fixed by contract or by the utility itself, unless limited in some manner by the terms of the Act, or the State has previously suspended its regulatory powers in respect to the rates or charges in question.

But it is suggested that to so construe it would give the Act a retroactive effect, and as such an intent is not clearly expressed, it must be construed prospectively, and all existing contracts therefore, be excluded from its operation. We do not think, however, that either the Act itself, or Sec. 16 of Chap. 55 prohibiting unjust and unreasonable rates, affects the validity of any existing contract. All such con-

tracts remain valid, binding obligations unaffected in their terms, until the Utilities Commission has found that the rates contained therein are "unjust, unreasonable or insufficient," when just and reasonable rates may then be substituted therefor. *Winfield* v. *Pub. Ser. Com.*, (Ind.) P. U. R., 1918, B. 747, 761; *Manitowoc* v. *Manitowoc N. & T. Co.*, 145 Wis., 13, 30. As said by the court in the last cited case:

"Until that determination is made, the contract is in force. When it is made, the contract is superseded, if the rate is changed."

Such contracts having been voluntarily entered into and their terms and rates agreed upon by all parties, in distinction from rates arbitrarily imposed by the utility, the rates fixed therein are presumed to be reasonable and just until otherwise determined by the Utilities Commission after hearing, either upon complaint of the consumer under Section 43, or of the utility under Section 50, or upon its own motion under Sec. 48 of Chap. 55. It is the rates at the time of the hearing that are adjudicated by the Commission. If then found to be unjust and unreasonable, they are from that time unlawful.

A utility cannot repudiate such a contract at will. Nor does the filing of new schedules under Section 28 have the effect of changing the rates fixed by contract. To obtain a change in such rates, except, of course, by mutual consent and with the approval of the Utilities Commission, the utility should proceed under Sec. 50 of Chap. 55 and first obtain, a finding by the Utilities Commission that the rates and charges fixed in such contract are "unjust, unreasonable or insufficient," whereupon the Commission may then substitute such rates as it shall deem to be just and reasonable in the premises.

Vested rights under existing contracts are, therefore, in no way affected by the terms of the Act itself, nor, as we view it, by its operation. All contracts relating to the public service are entered into in contemplation of the exercise of the right of the State's regulatory powers whenever the public interests may require. No vested rights can be gained by contract or otherwise as against the proper exercise of the police powers of the State. Nor does legislation vesting the police power in a subordinate body or commission create any new obligations or duties, or impose any new disabilities with reference to past transactions. *City of New York* v. *Foster*, 133 N. Y. S., 152. The duty to serve the public in a reasonable manner cannot be avoided by a contract. *Louisville N. R. Co.* v. *Mottley*, 219 U. S., 467, 485;

*Hudson Co. W. Co.* v. *McCarter*, 209, U. S., 349. Such duties and obligations as are required to be performed by Chapter 55 in respect to serving the public at just and reasonable rates, or such disabilities as are therein imposed on public service companies in this respect, have always existed whenever the State saw fit to exercise its powers. Such legislation in this respect, therefore, may be properly considered as prospective and not retroactive in its operation.

It is also urged that the exception of contracts entered into prior to January 1st 1913, in Sec. 34, of Chap. 55, indicates that it was the intent of the Legislature that all existing contracts should remain unaffected by this Act. But Sections 33 and 34 are penal sections. It was to remove any doubt as to the guilt of those giving or receiving any undue preference or advantage under contracts already existing that it was provided that continued service under such contracts should not be construed as constituting a discrimination within the meaning of these sections. *State ex rel* v. *Billings Gas Co.*, 55 Mont., 102, 112.

If the Legislature had intended to exclude from the operation of this Act all existing contracts over which the State had not already suspended its regulatory powers, we think it would have said so in express terms. Since there is nothing in the fact that rates have been mutually agreed upon in a contract, which renders them any less subject to regulation by the State than when arbitrarily determined by the utility itself, if any inference at all arises from the excepting of existing discriminatory contracts in Section 34, we think it is that all other existing contracts are included within the general terms of the Act. The main purpose of such legislation, viz: to secure adqeuate service to the public at just and reasonable rates, might, in a large measure, be defeated by the exemption from the operation of such laws of all rates fixed by contract entered into prior to their taking effect. No rates, however fixed, should, we think, be regarded as exempted from such general regulatory powers as are contained in Chapter 55, unless excepted in express terms or by necessary implication.

We, therefore, conclude from the general purpose of such legislation, and the broad and inclusive terms employed in Chapter 55 in conferring powers upon the Utilities Commission, and in the light of the judicial construction of similar Acts by other courts of last resort, that the Legislature intended to delegate to the Utilities

Commission of this State as complete power over rates fixed by prior contracts that have been determined to be "unjust and unreasonable" as the State itself then possessed. *Board of Survey of Arlington* v. *Bay St. Ry.*, 224 Mass., 463, 469. We think no rule of statutory construction is violated in so construing this Act. Black on Interpretation of Laws, pages 136, 137. As to whether rates in a prior contract that may be classed as discriminatory under Sections 33 and 34, may upon any grounds be modified by the Utilities Commission after hearing is not raised in these proceedings.

The cases of *Interurban R. & T. Co.* v. *Public Utility Co.*, 98 Ohio St., 287; and *Quimby* v. *Public Service Corp.*, 223 N. Y., 244, are cited by complainants as the most recent decisions by courts of high standing in support of their contention that authority over rates fixed by contracts will not be construed as vested in a regulatory commission unless clearly conferred in express terms. The New York Court of Appeals, however, has since differentiated the case of *Quimby* v. *Pub. Ser. Corp.*, and held in *People ex rel* v. *N. Y. Pub. Ser. Com.*, 225 N. Y., 216, a case now being followed by the Public Service Commissions of that State, (*Sag Harbor* v. *Long Island Gas Corp.*, P. U. R. 1919, E. 163,) under similar language to that contained in Chapter 55, that the power to regulate rates for gas fixed by prior contracts was vested by the New York statute in its Public Service Commission. Also see *Koehn* v. *Pub. Ser. Com.*, 176 N. Y. S., 147.

We are confirmed in our views by the reasoning and conclusions in the following cases in addition to those already cited: *Atlantic Coast El. R. Co.* v. *Bd. of Pub. Util. Comrs.*, 92, N. J. L. 168. *O'Brien* v. *Bd. of P. U. Com.*, 92 N. J. L. 44; *Pawhuska* v. *Pawhuska Oil & Gas Co.*, (Okla.) P. U. R. 1917, F. 226. *State ex rel City of Sedalia* v. *Pub. Service Com.*, 275 Mo., 201. *Leiper* v. *Balt. & Phila R. R. Co.*, 262 Pa. St., 328. *Milwaukee El. R. & Light Co.* v. *Railroad Com.*, 153 Wis., 592. *Dawson* v. *Dawson Telegraph Co.*, 137 Ga. 62. *Traverse City* v. *Mich. Railroad Com.*, 202 Mich., 575. *Salt Lake City et al.* v. *Utah Light & Traction Co.*, (Utah), P. U. R. 1918, F. 377. *Raymond Lumber Co.* v. *Raymond Lt. & W. Co.*, 92 Wash., 330. *Sandpoint W. & L. Co.* v. *Sandpoint*, 31 Idaho, 498.

While conclusions in some of the above cases have been reached under constitutional provisions peculiar to the State, in which the decision was rendered the reasoning is not entirely inapplicable. On the other hand, the result reached by the Ohio and Virginia Courts,

*Interurban Terminal & Ry. Co.* v. *Public Utilities* (Ohio), *supra.* *Virginia-Western P. Co.* v. *Com. ex rel Clifton Forge,* P. U. R. 1919, E. 766, were determined or, at least, the judgment of the court was influenced by special provisions of their State Constitutions not found in our own Constitution.

The only question raised by the exceptions is the authority of the Public Utilities Commission to regulate or change the rates for service by any public utility that have previously been fixed in a contract between such utility and a municipality or a private consumer, if such rates are or have become unjust or unreasonable. The Utilities Commission, a body specially clothed with all the authority of the State for the performance of an important governmental function, having determined, after hearing, that the rates, tolls, or charges of any utility, whether fixed by contract or by the utility itself, are in fact unreasonable and unjust, we must assume, at least in the absence of exceptions to any rulings of law in connection with such findings, that it has so determined upon considerations that affect the public interest. Upon this point we must treat the conclusions of the Commission in the cases at bar as a finding of fact properly determined. The rates fixed in the contracts between the towns of Searsport and Lincoln and the respondent Companies, then, being or having become unjust and unreasonable, the question before this court under the exceptions is: Did the Public Utilities Commission have the power and authority to order reasonable and just rates substituted therefor. We think it had.

> *Entry must be,*
> *Exceptions overruled.*
> *Result to be certified by the*
>    *Clerk of this Court to the*
>    *Clerk of the Commission.*