**Anthony J. NATALE**

**v.**

**KENNEBUNKPORT BOARD OF ZONING APPEALS.**

Supreme Judicial Court of Maine.

Sept. 30, 1976.

Murray, Plumb & Murray by Richard H. Field, E. Stephen Murray, Portland, for plaintiff.

Wilson, Steinfeld, Murrell, Barton & Lane by Charles A. Lane, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE,* POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

Under Rule 80B, M.R.C.P., Anthony J. Natale, as plaintiff, brought two com-

---

* WEATHERBEE, J., sat at argument but died before the opinion was adopted.

plaints in the Superior Court (York County) against defendant Kennebunkport Board of Zoning Appeals for judicial review of that Board's action in: (1) revoking a building permit which had been issued to plaintiff for construction of a garage apartment, and (2) requiring plaintiff immediately to remove "all construction, additions and materials" found by the Board to be in violation of the Kennebunkport Zoning Ordinance.

Defendant Board filed an answer which we view as including a counter-claim seeking a mandatory injunction against plaintiff to compel him to comply with the Board's order for immediate removal of "all construction, additions and material."

Plaintiff then moved for summary judgment in his favor. Considering plaintiff's motion, the presiding Justice concluded that the pleadings raised no genuine issue of material fact and, as a matter of law, judgment should be in favor of defendant. Accordingly, pursuant to Rule 56(c) M.R. C.P., the Justice ordered judgment for the defendant, thus affirming the correctness of defendant's action in revoking the building permit issued to plaintiff. The Justice also ordered issuance of an injunction commanding plaintiff to restore his garage to its condition prior to the renovations plaintiff had commenced.

Plaintiff has appealed from the judgment entered in the Superior Court (as embodying, also, the mandatory injunction against him).

We sustain the appeal.

The parties agree as to the following facts.

On August 28, 1974, the Building Inspector[1] of Kennebunkport issued to plaintiff a permit covering a building which had been used as a garage when the Kennebunkport Zoning Ordinance was enacted. The building was situated in the so-called "Village Residential" Zone as established by the ordinance.[2] The permit approved plaintiff's plan to convert the garage to a rental apartment.

A local resident appealed to defendant Board from the Building Inspector's issuance of the permit. After a hearing on October 21, and a rehearing on December 4, 1974, defendant Board revoked plaintiff's permit on the ground that there was no authority to issue it under Section 3 (B)(1) of the ordinance. That section reads as follows:

"B. In the Village Residential Zone, only the following uses of land and buildings shall be permitted:

"1. Single family residences, no more than one to a lot. The renting of rooms and apartments in buildings existing as of the effective date of this ordinance shall not be considered a violation of this ordinance, provided there shall be no external evidence of such rental except one sign not to exceed four square feet in area. No such rental shall be permitted in buildings or portions of buildings erected after the effective date of this ordinance." (emphasis supplied)

We are called upon in this appeal to interpret the Kennebunkport Zoning Ordinance and decide whether, as to the three words above underscored, "existing" modifies "renting" or "buildings."

The view of defendant Board, and of the Superior Court, was that "existing" modifies "renting", and, therefore, only apart-

---

1. Section 15 of the Kennebunkport Zoning Ordinance imposes on the Building Inspector a general duty of enforcement and the specific duty to issue permits to erect, move or alter structures.

2. To effect its comprehensive land use plan the Kennebunkport Zoning Ordinance, at Section 2, divides the town into 10 zones. The Village Residential Zone, delineated by Section 3(A) of the ordinance, surrounds the commercial area known as "Dock Square."

ments in operation in the Village Residential Zone on the effective date in 1972 comply with Section 3(B)(1). Plaintiff contends that "existing" modifies "buildings" and, hence, the Board committed error of law in revoking the permit issued to him authorizing conversion to an apartment of a garage building *existing* as of the effective date of the ordinance.

 In construing ordinances and statutes, this Court seeks the purpose of the enactors as it may have been objectively manifested. *King Resources Company v. Environmental Improvement Commission,* Me., 270 A.2d 863, 869 (1970). Further, specifically as to zoning ordinances, we must interpret each section in harmony with the overall scheme envisioned by the municipality, since zoning is by statutory definition

"pursuant to and consistent with a *comprehensive* plan" 30 M.R.S.A. § 4962(1)(A) (emphasis supplied)

which delineates the

"past, present and future trends of the municipality with respect to its population, housing, economics, social patterns, land use, and water resources and their use, transportation facilities and public facilities . . .." 30 M.R.S.A. § 4961(1)

 We find by study of the entirety of the Kennebunkport Zoning Ordinance of March, 1972, as amended, that the ordinance reflects an overall design which resolves in favor of plaintiff the ambiguity in Section 3(B)(1).[3]

It is apparent from the ordinance as a whole that the people of Kennebunkport determined to preserve the present external appearance of their historic riverfront and seacoast areas. To accomplish this objective the Kennebunkport Zoning Ordinance employs 10 zones to regulate the pace of change in the town, differentiating older, developed areas along the ocean and the Kennebunk River, both residential and otherwise, from the more open, inland section. Owners in the so-called "Free Enterprise" Zone, which comprises most of the inland portion of Kennebunkport, enjoy unrestricted use of their property subject to limited exceptions. (Section 12) In contrast, owners in the other 9 zones, covering river, village and coastal sections, must confine their activities to uses specifically permitted. Those permitted tend to ensure continuity of the present appearance of these areas by allowing existing commercial areas to remain,[4] proscribing visible evidence of business activities in residences,[5] curtailing the use of mobile homes,[6] restraining proliferation of con-

---

**3.** Plaintiff has argued that the placing of "existing" after the noun "buildings" by itself establishes, beyond ambiguity, that it modifies that noun. Yet, ambiguity arises because zoning ordinarily concerns itself with the regulation of *uses*; any restriction of *buildings* usually focuses on size and set-back requirements. Since Section 3(B)(1) governs a use, namely, "rental", and refers neither to building size nor set-back, it could be reasonable, regardless of the immediacy of word conjunction, to construe "existing" as modifying "renting" rather than "buildings."

**4.** In the Village Docksquare, Cape Porpoise Square and Village Riverfront Zones, for example, the ordinance permits retail stores, restaurants, beauty shops, hotels and other non-residential uses. Sections 4(B), 5(B), 9(B).

**5.** The ordinance allows operation of professional offices in single family dwellings in the Village Residential, Village Riverfront, Cape Arundel, Goose Rocks, Cape Porpoise East, Cape Porpoise Square and Cape Porpoise West Zones, provided such use occurs "wholly within the building" and occasions "no external evidence of such use beyond one sign, containing not more than two square feet of area, situated on the premises." Sections 3(B)(7), 5(B)(1), 6(B)(2), 7(B)(4), 8(B)(4), 9(B)(1) and 10(B)(1).

**6.** Mobile homes "for any purpose" are prohibited in the Village Residential, Village Docksquare, Village Riverfront, Cape Arundel, Goose Rocks and Cape Porpoise East Zones, and allowed at Cape Porpoise West only upon approval of the Board of Appeals and only for residential use. Sections 3(C),

spicuous signs,[7] and providing Board supervision of unusual public utility construction.[8]

Given the concern for preservation of older buildings evidenced by this comprehensive design, we are satisfied that Section 3(B)(1) of the ordinance is directed to the prevention of *new construction* for rental purposes rather than *rental use per se.*

This conclusion is buttressed by a comparison of Section 3(B)(1) with other sections applicable to other zones which contain language parallel to that of Section 3(B)(1).

Section 6(B)(1), for example, permits in the Cape Arundel Zone the following:

> "Single family residences, no more than one to a lot. Rental of no more than one apartment, in buildings existing as of the effective date of this ordinance shall be permitted, as a variance, but only on appeal to the Board of Appeals and provided no external alteration of such building to permit such rental shall be necessary, and further provided that no external signs of any sort advertising such rental shall be permitted. No such rental shall be permitted in any building erected after the effective date of this ordinance."

Three aspects of this language are significant to show that Section 3(B)(1) refers not to existing "renting" but to existing "buildings."

First, Section 6(B)(1) allows residents of the Cape Arundel Zone to lease one apartment *as a variance.* Implicit in this characterization of such "rental" is that it commence *after* the effective date of the ordinance; any rental antedating 1972 would continue indefinitely under Section 13(A)(1) as a nonconforming use without resort to variance procedures. Thus, Section 6(B)(1) must be construed as referring to rentals other than those existing on the effective date, namely, subsequent rentals occurring in buildings existing at the time the ordinance became effective. It would be reasonable, then, to give this interpretation to the similar language in Section 3(B)(1).

Second, Section 6(B)(1) clarifies the meaning of the word "portions" in the last sentence of Section 3(B)(1). That sentence reads:

> "No such rental shall be permitted in buildings or portions of buildings erected after the effective date of this ordinance."

Its counterpart in Section 6 eliminates the reference to "portions." Reading Section 3(B)(1) alone, we could deem "portions of buildings" to refer to internal renovation of, as well as exterior addition to, existing structures. Comparison with Section 6(B)(1), however, leads to the conclusion that "portions" comprehends only external additions. In more precise fashion, Section 6(B)(1) permits operation of an apartment only where "no *external alteration* of . . . [the existing] building to permit such rental shall be necessary" (emphasis supplied) and deletes reference to "portions" in its last sentence. It appears a reasonable interpretation that "portions" was deleted in Section 6(B) because the drafters considered the previous ban in Section 6(B)(1) on "external alteration" sufficient, and they wished to avoid repeti-

---

4(C), 5(D), 6(C), 7(C), 8(C) and 10(B)(4). The inland Free Enterprise Zone, however, limits the introduction of trailers only by forbidding their clustering in permanent trailer parks. Section 12(B)(1)(e).

7. Section 13(A)(6) prescribes permissible dimensions for on- and off-premises signs, and bans entirely the use of flashers and neon light.

8. Erection of aboveground utility facilities other than routine pipes, poles and wires requires approval as a variance under Section 13(A)(8).

tion. Yet, such concern to avoid repetition would be engendered only if the drafters regarded the word "portions" as limited in meaning to exterior construction. Once again, then, we discern a preoccupation with the external appearance of buildings —rather than with their use—which pervades the Kennebunkport plan and sharpens the focus of Section 3(B)(1).

Third, the use of the word "such" to modify "building" in the second sentence of Section 6(B)(1) makes no sense if the word "existing" describes "rental." "Such" requires a prior categorization of buildings—an antecedent—which the adjective "existing" supplies.

It is unconvincing to argue that the drafter's unmistakably clear reference in Section 6(B)(1) to existing *buildings* indicates that Section 3(B)(1) should be interpreted to deal with existing *rentals*—on the rationale that the same drafters knew how to write the clear language appearing in Section 6 but yet did not resort to it in Section 3. The Section 6 provisions for Cape Arundel deviate from those in Section 3 governing the Village Residential Zone because Section 6 is directed to other substantive purposes requiring more elaborate language. The restrictions imposed on Cape Arundel residents are more onerous: (1) they may not maintain more than one apartment and may not rent rooms; (2) they must secure Board approval as if for a variance; (3) they must accomplish any such rental without exterior alteration. Thus, we attribute the differences in language to degree of regulation rather than to a desire to cut off all future rental uses in one zone. Additionally, we note that the participle "existing" appears in the same place in both versions. Since in Section 6(B)(1) it is unequivocally plain that "existing" modifies "buildings", it is reasonable to conclude that had the drafters in writing Section 3(B)(1) intended that in Section 3(B)(1) "existing" should modify "renting" rather than "buildings", the

drafters would have taken pains, in writing Section 3(B)(1), to deviate markedly from the structure of Section 6(B)(1); yet, this was not done.

Also instructive is Section 4(B)(6), the rental provision governing the Village Docksquare Zone, which, in language paralleling that of Section 3(B)(1), permits:

> "Rental of offices, rooms and apartments in buildings existing as of the effective date of this ordinance. Such rentals in buildings or portions of buildings erected after the effective date of this ordinance may be permitted as a variance, but only on appeal to the Board of Appeals."

We find in this portion of the ordinance further confirmation, in two respects, of our interpretation of Section 3(B)(1).

The juxtaposition of the two sentences here, like the use of the word "such" in Section 6(B)(1), precludes a reading of "existing" as modifying "rental." Instead, the first sentence plainly must be taken to permit rental *at any time* in *structures* which were *existing* as of the effective date of the ordinance, since the second sentence allows rental, in particular circumstances (as a variance),

> "in buildings or portions of buildings *erected after* the effective date of . . . [the] ordinance." (emphasis supplied)

These two sentences, in combination, show that the distinction relates to the nature of the buildings—i.e., as existing on the effective date of the ordinance or as subsequently constructed—not the uses of buildings. Also, the second sentence of Section 4(B)(6) sheds light on the function of the last sentence of Section 3(B)(1). The owner in the Village Docksquare Zone may petition the Board of Appeals for a *variance* allowing rentals in new buildings or portions thereof. It is, therefore, reasonable to regard Section 3(B)(1)'s total ban on such rentals as abundance of cau-

---

tion by the drafters lest any person in the Village Residential Zone seek to avail himself of the "variance" benefits provided to Dock Square owners in Section 4(B)(6).

We conclude that Section 3(B)(1), correctly interpreted as to its legal intendment, authorizes plaintiff Natale's planned conversion of his garage. The judgment of the Superior Court holding to the contrary was error.

The entry is:

*Appeal sustained.* [9]

DELAHANTY, J., did not sit.

All Justices Concurring.

9. Since we have sustained plaintiff's appeal concerning the correct interpretation of the Kennebunkport Zoning Ordinance, we have no present occasion to consider whether the Justice presiding in the Superior Court, after he had arrived at his opinion agreeing with defendant's interpretation of Section 3(B)(1) of the ordinance, should have ordered issuance of an injunction without holding a hearing to evaluate whether an injunction would require plaintiff to change his position at a cost undue in relation to the injury caused to the zoning interests of the Town. One having a cause of action against another is not thereby *automatically* entitled to an injunction as a matter of right, since an evaluation of all of the facts material to an appropriate balancing of the equities might show that resort to the remedy of injunction might be unduly harsh in all the circumstances. See: *Coombs v. Lenox Realty Company*, 111 Me. 178, 181, 182, 88 A. 477 (1913) ; but see also: *Lewiston v. Grant*, 120 Me. 194, 201, 113 A. 181 (1921).