NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY

v.

PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

July 26, 1977.

---

Pierce, Atwood, Scribner, Allen & McKusick by Vincent L. McKusick, Everett P. Ingalls, George J. Marcus, Portland, Robert D. Bruce, Christopher M. Bennett, Boston, Mass., for plaintiff.

Thomas R. Gibbon, Horace S. Libby, Alan G. Stone, P. U. C., Augusta, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

We have specially expedited our consideration and decision of an important, and potentially dispositive, issue raised in two complaints brought pursuant to 35 M.R.S.A. § 305 by New England Telephone and Telegraph Company (New England) against the Public Utilities Commission (Commission). The question is whether, as contended by New England, a schedule of rates "proposed" by New England (by a filing made with the Commission on September 10, 1976) became effective, by operation of law, on June 8, 1977—despite an adjudication by the Commission that said proposed rates, calculated to yield New England increased

annual revenues of approximately $27 million dollars, were neither just nor reasonable.

We decide the issue against New England's contention.

### 1—The History and Nature of the Proceedings

On August 10, 1976 this Court had ordered the Commission to undertake an investigation pursuant to 35 M.R.S.A. §§ 296 and 306 of the justness and reasonableness of temporary rates then being collected by New England. *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 758 (1976). The Commission commenced that investigation, which is hereinafter styled the "§§ 296–306" proceeding.

New England's aforementioned September 10, 1976 filing of a "proposed" schedule of rates, under the authority of 35 M.R.S.A. § 64,[1] triggered an additional rate investigation when the Commission responded to the filing by exercising its powers, under 35 M.R.S.A. §§ 64 and 69,[2] to inquire into the justness and reasonableness of the schedule of rates proposed by New England. In connection with this investigation the Commission also exercised its power to suspend New England's proposed schedule of rates for an initial period of 3 months, thereby to prevent the proposed schedule from becoming effective by operation of law, under § 64, upon the expiration of 30 days from the date the proposed schedule was filed. This case involving the investigation of New England's proposed schedule of rates is hereinafter styled the "§ 64–69" proceeding.

Although the above-described two investigations by the Commission were legally different,[3] the Commission and New England agreed that they be consolidated for practical reasons.

Under its authority pursuant to § 69, the Commission purported to extend the initial 3 months suspension it had effectuated in the §§ 64–69 proceeding for a further period of 5 months. In consequence of this action, the Commission conceived the second suspension effective until June 10, 1977. By contesting the correctness of this conception, New England precipitates the core issue now before us for decision.

Hearings were held in the consolidated case in March and May, 1977. Final briefs were filed on May 20, 1977. On June 7, 1977 the Commission issued an order containing its ultimate findings as to the §§ 64–69 part of the consolidated case. That order found that: (1) the rates in the proposed schedule filed by New England on September 10, 1976 were unjust and unreasonable and (2) rates effecting an annual revenue decrease of no less than $1.9 million were just and reasonable. Accordingly,

---

1. Section 64 provides:
 "No change shall be made in any schedule, including schedules of joint rates, except upon 30 days' notice to the commission, and all such changes shall be plainly indicated upon existing schedules by filing new schedules in lieu thereof 30 days prior to the time the same are to take effect. The commission may, in its discretion and for good cause shown, allow changes upon less than the notice specified, or modify the requirements of this section and section 65 in respect to publishing, posting and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions."

2. *Section 69*, as will be developed more fully infra, authorizes Commission investigation of rates proposed by a utility under § 64, and empowers the Commission to suspend implementation of such proposed rates pending such investigation for a period of up to eight months.

3. As ordered by this Court by virtue of § 296, the Commission in the §§ 296–306 proceeding was to address the justness and reasonableness of *temporary* rates charged from and after July 21, 1975 by New England. *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 751 (1976). The Commission in the §§ 64–69 proceeding was concerned only with the justness and reasonableness of the rates *proposed* on September 10, 1976 by New England—the $27 million request. Despite this difference, however, the Commission would have to determine in both cases a rate it found just and reasonable as the standard by which to measure both the temporary rates still in effect and those proposed on September 10, 1976.

the Commission disallowed the proposed September 10, 1976 schedule. In addition, by virtue of powers reposing in it under 35 M.R.S.A. § 69, as incorporating powers granted the Commission under § 294,[4] the Commission ordered the filing of substitute rates designed to effect the $1.9 million decrease found by the Commission to be just and reasonable. New England was to file schedules containing such substitute rates no later than noon on June 9, 1977. The June 7 order also stated expressly that subsidiary findings supporting its ultimate conclusions would follow in an order to be issued June 10, 1977.

The June 10 order was directed at the entire consolidated case rather than the §§ 64–69 action alone. As to the §§ 64–69 proceeding, the June 10 order fleshed out that of June 7. It set forth in detail the rationale for rejection of both the temporary rates then being charged and the rates proposed by New England on September 10, 1976. It further recited Commission findings and conclusions in regard to the rate design approved to produce the ordered $1.9 million decrease in annual revenue.

Before the Commission issued its June 10 order, New England commenced, on June 8, 1977, an action in this Court pursuant to 35 M.R.S.A. § 305, asking us to adjudicate that the schedule of rates proposed by it on September 10, 1976 had gone into effect by operation of law on June 8, 1977. New England asserted that this had occurred because the Commission's order of June 7

(though a timely order for the purpose) was insufficient in its content to prevent the effectiveness, by operation of law, of New England's proposed rate schedule. On June 9, 1977, pursuant to powers reposing in him under § 305, the Chief Justice stayed the effect of the June 7 order, his intention being to maintain the status quo ante, i. e., the continued effectiveness of the temporary rates in effect since July 21, 1975.

After the issuance of the Commission's June 10 order, New England filed a second complaint invoking § 305. This complaint consisted of two counts.

Only the first count[5] is presently before us. It alleges that the June 10 order was issued when the Commission no longer had power to act. Repeating its allegation that the June 7 order was insufficient in content to toll implementation of the proposed rates *by operation of law,* New England renewed its prayer for the relief sought in the earlier complaint. On June 14, 1977 the effect of the Commission's June 10 order, like that of the June 7 order, was stayed by the Chief Justice.

By procedural order of the same date[6] we accelerated our consideration of the issue raised by both the first § 305 complaint and Count 1 of the second § 305 complaint: —whether either, or both, of the Commission's two orders had prevented New England's proposed schedule of rates from becoming effective by operation of law.

---

4. Section 294 provides, in pertinent part:
 "If upon such formal public hearing the rates, tolls, charges, schedules or joint rates shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of chapters 1 to 17, the commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just or reasonable."

5. The second count alleges constitutional and other legal error in the determinations of the Commission underlying its disallowance of the proposed rates and order of substitute rates.

6. Section 305 states that "[t]he procedure before . . . [the Law] court shall be that prescribed . . . in the particular proceeding or by . . . rules, if any, applicable

thereto . . . ." Presently, there is no general rule governing § 305 proceedings; this Court issues a procedural order to govern each case. In the situation now before us the important issue raised by New England's first § 305 complaint, and Count 1 of its second complaint, is readily severable from the rest of the case, and delay in consideration of it until all issues raised have been heard could result in tremendous financial loss to New England should New England's claim be upheld on the usual prospective basis allowing New England the $27 million dollar revenue increase only from the date of this Court's decision. For this reason we accelerated consideration of New England's first § 305 complaint and Count 1 of its second § 305 complaint.

## 2—The Merits

New England contends that the Commission's erroneous interpretation of § 69 led the Commission to miscalculate the terminal point of the suspension periods. As a result, according to New England, first, the June 10 order—conceded by New England to be sufficient in content to bar the effectiveness by operation of law of New England's proposed schedule of rates—was too late for this purpose because issued after expiration of the period during which the Commission had suspension power to prevent such effectiveness; and, second, the June 7 order, though timely, was insufficient in its content to preclude the effectiveness by operation of law of New England's proposed schedule of rates. Hence, in New England's view, the schedule of rates proposed on September 10, 1976 went into effect by operation of law on June 8, 1977.

The Commission counters with the contentions that: (1) the June 10 order was issued in time to prevent the effectiveness by operation of law of New England's proposed schedule of rates and (2) in any event, this result was accomplished by the order of June 7 which New England acknowledges was a timely order.

We decide that the Commission is correct in its position that the order of June 10 was forthcoming in time to prevent the effectiveness by operation of law of New England's proposed schedule of rates. We therefore need not reach, and intimate no opinion on, the alternative question of whether the June 7 order, unquestionably timely, had sufficient content to achieve the same result.

Since New England's attack on the timeliness of the June 10 order focuses on the meaning of § 69, a preliminary survey of the statutory framework is in order.

Under § 64, schedules of rates proposed by a utility cannot become effective until 30 days after they are filed unless the Commission accelerates their effectiveness. As here pertinent, § 69 provides:

"Whenever the commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission . . ., it shall have power at any time before the effective date of such change or changes . . . to hold a public hearing and make investigation as to the propriety of such proposed change or changes. . . After such hearing and investigation, the commission may make such order with reference to any new rate, . . . proposed as would be proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation.

"Pending such investigation and order, the commission may at any time within said period preceding the effective date of any such schedule, by filing with such schedule and delivering to the public utility affected thereby a statement of its reasons for said suspension, suspend the operation of such schedule or any part thereof, but not for a longer period than 3 months from the date of said order of suspension. If said investigation cannot be concluded within said period of 3 months, said commission may in its discretion extend the time of suspension for a further period of 5 months."

Under §§ 64 and 69, then, the Commission may either (1) step in to investigate rates filed under § 64 and order their implementation in fewer than 30 days, or (2) enlarge the period of investigation by delaying the effective date beyond the expiration of that initial 30-day period for additional 3- and 5-month periods. The total maximum investigation period contemplated by §§ 64 and 69, operating together, is thus 8 months and 30 days.

The Commission purported to avail itself of this maximum period of investigation in the consolidated New England case. By its count, the 30-day period of § 64 expired on October 10, 1976, 30 days after the September 10 filing of New England for the $27 million increase. In the Commission's view, it then achieved a further 3-month extension of the suspension commencing October 11, 1976 and ending January 10, 1977, and a final 5-month extension commencing January 11 and ending June 10, 1977.

In so calculating the suspension periods, the Commission contends that it was free to invoke the 3- and 5-month extensions by an order *issued before the last day of the next preceding period, but specifying the beginning date of the new period.*

New England rejects this contention of the Commission, maintaining that § 69 must be read to gear the commencement of suspension periods to *the date on which the order of suspension is actually issued by the Commission* rather than to such later date as the Commission might specify in the order. Under New England's interpretation of § 69, the aggregate of the suspension periods in this case terminated on June 7, 1977.

 In support of its position, New England argues that the words, "3 months from the date of said order of suspension", appearing in the second paragraph of § 69 have a plain meaning which admits of no reasonable interpretation other than as claimed by New England.

We disagree.

While, generally, we endeavor to give effect to the "plain meaning" of legislation as objectively manifested on its face, *Chase v. Edgar,* Me., 259 A.2d 30 (1969), we have nevertheless emphasized that:

"Legislative intent is the fundamental rule in the construction or interpretation of statutes." *King Resources Company v. Environmental Improvement Commission,* Me., 270 A.2d 863, 869 (1970).

See also: *Depositors Trust Company of Augusta v. Johnson,* Me., 222 A.2d 49, 51 (1966); *Natale v. Kennebunkport Board of Zoning Appeals,* Me., 363 A.2d 1372, 1374 (1976). Thus, we have disregarded the strict letter of statutes to avoid absurd results. See: *Cornwall Industries, Inc. v. Maine Department of Manpower Affairs, Employment Security Commission,* Me., 351 A.2d 546, 552–553 (1976). In any event, even assuming the correctness of New Eng-

land's contention here—that we may consider factors extrinsic to the statute under analysis only where it is ambiguous—we conclude that, for the purposes now under consideration, § 69 is ambiguous.

The phrase upon which New England has focused is contained in a sentence of § 69 reading as follows:

"Pending such investigation and order, the commission may at any time within said period preceding the effective date of any such schedule, by filing with such schedule and delivering to the public utility affected thereby a statement of its reasons for said suspension, suspend the operation of such schedule or any part thereof, but not for a longer period than 3 months from the date of said order of suspension."

This full context makes apparent the ambiguity which lurks in the phrase, in particular because of the word "said" which modifies "order of suspension."[7] The sentence and the preceding paragraph refer to only one "order", and that "order" is clearly not one of suspension of proposed rates but rather of approval of new rates or other measures. The procedure regarding suspension delineated in the sentence nowhere mentions promulgation of an "order." Instead, it appears merely to contemplate return to the utility of the schedule filed under § 64, accompanied by a statement of the Commission's reasons for the suspension. Yet, by speaking of *"said* order of suspension" (emphasis supplied), the section seems to be referring to a *previous* order bearing on suspension.

The mystery thus precipitated is a sufficient indication of ambiguity to require that we seek guides to meaning in other statutory language and in the legislative purposes underlying § 69.

Such investigation persuades us that the Commission's interpretation of § 69 is correct.

---

7. We may note that it is also arguable that the phrase "date of said order" is ambiguous in itself, regardless of the context. These words could mean date signed, date docketed, or, as contended by the Commission, date specified therein. Because, however, we discern ambiguities in the meaning of "from the date of said order of suspension" as juxtaposed to the entire sentence, we need not confine ourselves to this argument.

We find, first, a reliable indication of legislative intent in the textual language of § 69 itself. As noted earlier, that section provides for both an initial suspension of 3 months and a subsequent one of 5 months. The words "from the date of said order" appear only in connection with the initial 3-month suspension. As to the 5-month suspension period, the language is:

"If said investigation cannot be concluded within said period of 3 months, said commission may in its discretion extend the time of suspension for a *further* period of 5 months." (emphasis supplied)

Implicit in the legislative use of the word "further" is the assumption that the 5-month period will commence at the expiration of the preceding 3-month period of suspension. Yet, taking the construction of § 69 urged by New England, such can be the case only if the Commission "order" invoking the 5-month period is signed on the last day of that 3-month period, a circumstance which cannot be regarded as certain or even likely to occur.

■ We think this use of the word "further" strongly militates against transposing to the 5-month period of suspension prescribed by § 69 the reading which New England would attribute to the 3-month suspension period therein authorized. Yet, we discern no good reason why the Legislature should have provided one method for calculating the 3-month period and another for the 5-month period. Hence, we conclude that *each* of the suspension periods authorized by § 69 may commence on a date specified in the "order" (for commencement of the suspension) which is later than the date on which the order is actually issued.

Second, we are unable to perceive any realistic goal of public policy which New England's version of § 69 would achieve. On the contrary, that construction would frustrate stated legislative purposes.

■ The Commission rightly points out that reading § 69 to gear suspension periods to the day on which the Commission signs a document will create practical problems of inconvenience. Orders would have to be signed on Sundays and holidays; even on weekdays Commissioners or staff personnel [8] might have to postpone travels on Commission business in order to be present to sign an order. We prefer a reading of § 69 to permit the flexibility to issue such an order before its effective date, and specify therein such effective date.[9]

■ Far more important, the overriding purpose of the entire public utility statute, and of § 69 in particular, is to seek to assure, to the greatest extent possible, that effective rates shall be just and reasonable rates. 35 M.R.S.A. § 51; *In re Searsport Water Company,* 118 Me. 382, 108 A. 452 (1919).

We had recent occasion, in *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 354 A.2d 753, 756–764 (1976), to trace the history of § 69 and other provisions of the public utility statute. As we there related, all utilities originally set their own rates (by virtue of the original version of § 64), and there was no provision equivalent to § 69. See: P.L. 1913, c. 129. In 1917, however, the ancestor of § 69 was enacted to empower the Commission to investigate such filed rates (except in the case of transportation of freight) to assure that they were indeed just and reasonable. P.L.1917, c. 44, § 1. In addition to providing this power, the precursor of § 69 also enabled the Commission to suspend implementation of the filed rates for a total period of 6 months (2 periods of 3 months each) pending its investigation.

**8.** The orders in this case were signed by the Commission's Secretary.

**9.** New England does not argue that the Commission could achieve the same flexibility under New England's version of § 69 merely by designating the last day of the preceding sus-

pension period as the date of its order regardless of the actual date of signature. Indeed, so to argue would be to recognize only the most technical distinction between New England's interpretation of § 69 and that urged by the Commission.

■ We view § 69, therefore, as specifically directed at curbing abuse of § 64, by providing mechanisms to prevent the implementation of a schedule of rates "proposed" which may not be just and reasonable. It follows that the Legislature intended to afford the Commission sufficient time for the proper discharge of the Commission's statutory responsibilities in this regard.

New England counters, however, with the claim that public policy also disfavors persistent resort to the maximum delays allowed by § 69 and seeks to achieve the determination of just and reasonable rates without undue "regulatory lag." See, for example, *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 757–758 (1976). New England contends that in these inflationary times the Legislature should be deemed to be more concerned with protecting utilities from attrition in rate of return caused by delays in rate cases than with the possible imposition on customers of unjust and unreasonable rates.

■ While we by no means suggest that the Legislature has not thought important the ability of utilities to realize sufficient revenues, we must weigh against this the oft-stated legislative concern, since enactment of the public utility statute in 1913, that those revenues be derived from rates which are just and reasonable to the customer as well as to the company. As we decided in *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 757–758 (1976), when considering the Commission's power to order after-the-fact adjustments to rates, our statute tolerates "regulatory lag" in normal times.

Indeed, we are not without statutory guidance in the specific context of an inflationary era. The Legislature once indicated its views on the problem of § 69 investigatory delays at a time of inflational pressures remarkably similar to those of the present day.

10. 1949 Legislative Record, pp. 339, 415.

11. In light of this conclusion rejecting the merits of New England's instant contentions, we

As above set forth, § 69 originally provided for two suspension periods of 3 months each. P.L.1917, c. 44 § 1. Presently, it provides that the second period comprise 5 months. The enlargement by 2 months of the second period was achieved by a 1949 amendment, P.L.1949, c. 16. That amendment, passed by both houses unanimously as an emergency measure,[10] noted in its preamble

"the present nation-wide inflationary trend in operating expenses . . . [which had] produced an unprecedented flood of rate cases requiring extensive investigation by the public utilities commission".

In reaction to this situation, and in spite of the resulting increase in "regulatory lag", the Legislature opted for further delay better to assure the adequacy of the Commission's determinations of just and reasonable rates.

■ We read § 69, then, as empowering the Commission to suspend a schedule of rates proposed under § 64 by an order which specifies an effective date for the order subsequent to the date of its actual issuance, provided that *both* the actual date of issuance and the future date specified for its effectiveness are within the period upon the expiration of which by operation of law the proposed rates would otherwise become effective.

Here, then, the Commission acted in conformity to statutory requirements to suspend until June 10, 1977 the effectiveness of New England's proposed schedule of rates. The June 10, 1977 order was, therefore, issued in time—and was sufficient in its content, as New England itself acknowledges—to prevent the effectiveness, by operation of law, of the schedule of rates New England had proposed.

New England's first § 305 complaint and Count I of its second § 305 complaint fail on the merits.[11]

The entries are:

find it unnecessary to decide, and intimate no opinion on, the question whether, in light of the nature of the contentions, we might have been without § 305 jurisdiction to address them.

(1) In KEN–77–25:

Judgment for defendant Public Utilities Commission on New England's § 305 complaint; and

(2) In KEN–77–28:

Judgment for defendant Public Utilities Commission on Count 1 of New England's § 305 complaint.

DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ., concurring.

NICHOLS, J., not concurring.