# CENTRAL MAINE POWER COMPANY

v.

# PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued Sept. 17, 1982.

Decided Jan. 14, 1983.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Gerald M. Amero (orally), William J. Kayatta, Jr., Peter H. Jacobs, Portland, for plaintiff.

Stephen A. Johnson (orally), Joseph G. Donahue, Kimball L. Kenway, Augusta, for Public Utilities Com'n.

Chadbourne, Parke, Whiteside & Wolff, Linwood A. Morrell, New York City, for Intern. Paper Co.

Michael N. Westcott, Asst. Atty. Gen. (orally), Augusta, for intervenor Atty. Gen., State of Me.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

WATHEN, Justice.

On June 29, 1981, Central Maine Power Company ("CMP", "Company") filed with the Commission proposed new rate schedules pursuant to 35 M.R.S.A. § 64 (Supp. 1982–83). The proposed rates were designed to produce a net increase in annual operating revenues equal to 15.3%, or $55,000,000, based upon a 1981 test year.

After extensive public hearings, the Commission entered its Decision and Order on March 27, 1982. That Order disallowed and rejected the schedule of proposed rates filed by CMP and authorized the Company to file a substitute rate schedule designed "to increase test year gross revenues on an across-the-board basis by no more than $31,895,000." Pursuant to the Commission's Decision and Order, CMP filed substitute rate schedules, and these schedules were approved by Supplemental Order No. 1, dated April 9, 1982.

CMP, pursuant to 35 M.R.S.A. § 303 (1975), has appealed from both the Commission's Decision and Order and Supplemental Order No. 1. In addition, CMP filed a Complaint with this Court pursuant to 35 M.R.S.A. § 305 (1977).

On appeal, the Company challenges the Decision and Order, together with the Supplemental Order, and contends that the Commission erred in determining the cost of equity, the allowance for attrition, working capital requirements and in refusing to allow the inclusion of certain advertising expense for ratemaking purposes. We sustain the Commission's order in all respects.

*I. Cost of Equity.*

In the present case in calculating the rate of return, the Commission found that CMP's cost of equity fell within a range of 15.4% to 15.6%, and assigned a cost of 15.4% to the Company's common equity. The Company, while not disputing the reasonableness of that range, argues that 15.4% is arbitrary, unreasonable, unlawful and confiscatory of its property in violation of the United States and Maine Constitutions. It asserts that the Commission, in essence, imposed a $500,000 "penalty" on CMP, by setting its cost of equity at the low end, rather than the middle, of the established range of reasonableness, and that it did so on the basis of alleged deficiencies in the Company's policies and management practices with respect to cogeneration and conservation.[1] CMP argues that the record does not support the finding of a deficiency in Com-

---

1. In its Order and Decision, the Commission noted:

 [i]f it were not for CMP's practices with respect to cogeneration and conservation, we would allow CMP a rate increase designed to provide it with a reasonable opportunity to earn a return of 15.5% on its common equity. However, for the reasons set forth below, we find that with respect to the promotion of

 conservation and cogeneration, the Company has not been operating as efficiently as possible nor has it been utilizing sound management practices. 35 M.R.S.A. § 51. Therefore, we will allow CMP a rate increase designed to provide it with a reasonable opportunity to earn a return of 15.4% on common equity.

pany policy and that in any event the imposition of a "penalty" constitutes error as a matter of law.

■ The determination of an appropriate rate of return is an essential function of the Commission in the ratemaking process. The rate of return is designed to provide sufficient revenue to cover the Company's total cost of service. Such costs include both the operating expenses of the utility and an adequate "return" on the investment in property and equipment serving the public. *See New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 448 A.2d 272, 284 (1982), (hereinafter "1982 NET Case").

In determining what constitutes a just and reasonable rate, this Court has relied upon two leading decisions by the United States Supreme Court:

A public utility is entitled to such rates as would permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.

*Bluefield Water Works & Improvement Company v. Public Service Commission*, 262 U.S. 679, 692–3, 43 S.Ct. 675, 678–679, 67 L.Ed. 1176 (1923) quoted in *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 390 A.2d 8, 31 (1978) (hereinafter "1978 NET Case").

We held in *Federal Power Commission v. Natural Gas Pipeline Co.*, [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942)], *supra*, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its ratemaking function, moreover, involves the working of "pragmatic adjustments." ... And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. ... *Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. ... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.* Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. (citations omitted) (emphasis added)

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287–288, 88 L.Ed. 333 (1944), quoted in *1978 NET Case*, 390 A.2d at 31–32.

■ One facet of the method employed by regulatory agencies to determine the fair rate of return, and one which was used in this case, is an analysis of the utility's cost of equity. The cost of equity is an expression of what the utility must earn (stated in percentages) in order to secure necessary financing from equity investors. *1978 NET Case, supra*, at 32. As to this task, this Court recently noted that:

Determining the cost of equity is one of the more difficult computations in the rate-making process. The Commission must concern itself with many economic variables and evaluate conflicting evidence interpreting and applying those variables. Because of the complexity of the task, the Law Court necessarily defers to the regulatory expertise of the Commission if the Commission's decision is supported by substantial evidence. We do not attempt to second-guess the Com-

mission on matters falling within its realm of expertise. Our review is limited to determining in the light of the record whether the Commission's conclusions are unreasonable, unjust or unlawful. The utility has the burden of proving that the Commission has erred. 35 M.R.S.A. § 307 (1978).

*1982 NET Case,* 448 A.2d at 287–88.

■ Again, the Company does not challenge the in..erent reasonableness of the 15.4%—15.6% range adopted by the Commission in this case with respect to its cost of equity. Rather, CMP asserts that the Commission adopted the range of reasonableness "as part of an attempt to insulate the unsupported penalty from judicial review." We have previously recognized, however, that ratemaking is an "inexact science" and, accordingly:

> The concept of a "just and reasonable" rate does not signify a particular single rate as the only lawful rate but rather encompasses a range [of reasonableness] within which rates may be deemed just and reasonable both in terms of revenue level and rate design. It is within the sound discretion of the Commission to fix the exact level and design within that range.

*Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302, 327–28 (1978). *See also Central Maine Power Company v. Public Utilities Commission,* Me., 405 A.2d 153, 182 (1979). Moreover, since this Court's review is limited to the "result reached and not the method employed" (*Hope Natural Gas Co., supra* ), it should not disturb the Commission's *result* so long as the cost of equity allowed is within a range of reasonableness supported by sufficient evidence.

■ On review, we find substantial evidence to support the Commission's position.

Before adopting the range of 15.4% to 15.6%, the Commission heard extensive testimony bearing on CMP's cost of equity. The estimates given in testimony, based upon various methods, ranged from 13.43% to 18.125%.

The Company nevertheless argues that since the Commission would have assigned a 15.5% cost of capital but for its alleged infirmities with respect to conservation and cogeneration, the Commission's decision, pursuant to 35 M.R.S.A. § 51 (1975),[2] to lower CMP's cost of capital to 15.4% must fail. It is not necessary to determine in this case, however, whether the Commission upon an adequate record may properly "penalize" a utility pursuant to section 51 for such reasons as the failure to effectuate the public policy expressed in independent state and federal energy legislation.[3] The Commission's determination of CMP's cost of equity in this case is independently supported by the record and falls within a range we find to be reasonable. Accordingly, we must uphold the Commission's decision as a proper exercise of discretion. *1982 NET Case,* 448 A.2d at 278.

*II. Attrition.*

The order of the Commission includes an attrition allowance of .05% or $672,000. The Company claims that result to be erroneous. It is asserted that the evidence compels an allowance equal to .60%, or approximately $8,000,000, in order to provide a fair rate of return. The substantial discrepancy results solely from the Commission's inclusion of Construction Work in Progress ("CWIP") and the associated Allowance for Funds Used During Construction ("AFUDC"), in computing the attrition allowance. It is the Company's position that the inclusion or "growth" of CWIP and AFUDC in attrition is error as a matter of

---

2. 35 M.R.S.A. § 51 states in relevant part:

 In determining just and reasonable rates, the commission may consider whether the utility is operating as efficiently as possible and is utilizing sound management practices.

3. *E.g.,* the Electric Rate Reform Act, 35 M.R.S.A. §§ 92–96 (1981–82 Supp.); the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C.A. §§ 2601–2645 (Supp.1982), and the Small Power Production Facilities and Cogeneration Facilities Act (SPPFA). 35 M.R.S.A. §§ 2321–2328 (1979).

law and that in this instance the Commission acted arbitrarily and unreasonably. While no authority is cited, the argument is advanced that the methodology employed in calculating attrition is antithetical and self-defeating.

Allowance for attrition is an accepted ratemaking procedure designed to assure a fair rate of return. This Court has long recognized that the inflexible use of the historic test year could result in an erosion of the rate of return. In appropriate cases we have approved the use of an attrition allowance and have looked with favor upon attempts to enhance the accuracy of the forecast:

> [W]e know with the maximum degree of certainty attainable in a forecast that in the period for which rates are to be set there will be an increase in net expense. To ignore this probability is to defeat the very idea of fixing rates for the future upon intelligent and informed estimates. Why should a probability such as this be set aside in favor of the experience of the test year, which we know with a certainty will not be repeated in the future? The experience of the test year is at best a "guess" for the future. If we can make the "guess" more in line with the probability, in the long run we will have benefited both public and Company.

*Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 236, 136 A.2d 726, 732 (1957). We have noted that "[a]ttrition, the tendency of the actual rate of return to diminish, has been said to result from two factors: —(1) steadily increasing construction costs, and (2) calculation of the rate of return in the year prior to that for which the return is calculated" *Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302, 316, n. 16 (1978).

There can be little dispute that an attrition adjustment is appropriate where supported by record evidence. It is the responsibility of the Commission, in the first instance, however, to weigh the evidence in determining the demonstrated need for such an allowance and to select an appropriate methodology for computation. *1978 NET Case,* 390 A.2d at 49; *Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302, 317 (1978).

The inquiry is complicated by the inclusion of the concepts of CWIP and AFUDC in the methods employed to calculate attrition. This Court has previously addressed these accounting concepts in the context of inclusion in rate base, but has not had prior occasion to consider their inclusion in an analysis of attrition.[4]

The facts of this case demonstrate that increased investment in construction produces substantial difficulty in determining rates. Section 51 mandates a fair rate of return and one which is sufficient to maintain the financial integrity of the Company. The Commission included CWIP and AFUDC in the attrition adjustment in an effort to balance the interests of the ratepayer and those of the investor. Contrary to the assertions of CMP, a claim of error in this regard is not resolved by fashioning an abstract proposition of law which confirms or denies the inclusion of CWIP and AFUDC. The Commission's decision must rest or fall upon the adequacy of its factual finding that a need for a greater attrition allowance has not been demonstrated. In *Central Maine Power Company v. Public Utilities Commission,* Me., 433 A.2d 331 (1981), for example, we concluded that the choice between a gross or net rate of capitalization for AFUDC was well within the discretion of the Commission and we noted that "[a]t bottom, that decision rests on the Commission's factual finding that 'a shift [from gross to net capitalization rate] is not now essential to the Company's financial integrity.' " *Id.* at 343.

Commission orders from other jurisdictions demonstrate that the treatment of

4. For purposes of determining rate base a matching principle is employed which typically results in CWIP being offset by AFUDC. *See* *Central Maine Power Company v. Public Utilities Commission,* Me., 433 A.2d 331, 342 (1981).

CWIP and AFUDC is totally dependent upon the facts of the particular case. Under certain circumstances, as investment in construction impinges on cash flow, it has been necessary to permit a return on utility property not yet ready for service. There are several examples of the inclusion of CWIP in rate base without offset by AFUDC. *See, e.g., Re Public Service Company of Colorado,* 41 PUR 4th 225, 238 (Colo.P.U.C.1980); *Re Tampa Electric Company,* 39 PUR 4th 553, 559 (Fla.P.S.C.1980).

 When dealing with either rate base or attrition, the appropriateness of inclusion or exclusion of CWIP and AFUDC is determined by the evidence contained in the record. The record in this case adequately supports the conclusion of the Commission that an attrition allowance of .05% is sufficient to maintain the financial integrity of the Company.

### III. Offset of Accrued Interest on Debt and Accrued Dividends on Preferred Stock to Working Capital Allowance.

The Commission ruled that accrued but unpaid interest on debt, and accrued but unpaid dividends on CMP's preferred stock, be treated as consumer-supplied capital and used to offset or reduce the Company's working capital requirement. As a result, the Company's working capital requirement, and therefore its rate base, was reduced by a net figure of $3,766,000.[5]

 An allowance for working capital is a ratemaking practice whereby the utility's rate base is adjusted to reflect those investor-supplied funds that "may be required by the utility to meet its day-to-day operating expenses." *1978 NET Case,* 390 A.2d at 51. An essential part of this allowance is the cash advanced portion of working capital which has been defined as "the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefore." *Id.,* quoting *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 309, 88 A.2d 59, 61 (1952).

 The most common method for determining the cash advanced portion of working capital is the so-called "lag" analysis which measures the number of days between payment of operating expense by the utility and collection of revenue from customers. When applied to components of expense, the days of cash lag yield the amount of money required to be put forth by investors for Company operations.

In this case a lag analysis was presented by both Mr. Stevenson, a Company witness, and Mr. Louiselle, a Staff witness, to compute the cash advanced portion of working capital. Although the two witnesses were in substantial agreement, Mr. Louiselle made an adjustment beyond those suggested by Mr. Stevenson to reflect the effect on working capital of accrued interest on debt and accrued dividends on preferred stock.[6] His reasoning was as follows:

> Interest on [long-term] debt is paid semi-annually while it is collected from customers through rates on a monthly basis. Since this lag exceeds the revenue lag, the Company has interest funds available for working capital purposes that are provided by customers. It must be stressed that these funds are not investor-provided funds, but rather, customer provided .... To disregard the effect of the lag in interest payments simply ignores reality and results in an overstatement of the rate base.

The Commission adopted Mr. Louiselle's analysis.

This Court has recognized that in determining the need for working capital, "the

---

**5.** The Commission decreased working capital by $3,820,000 to reflect the net lag on long-term and short-term debt interest and increased working capital by $54,000 to reflect the negative net-lag associated with preferred stock dividends.

**6.** The Company's revenue lag was computed at 47 days. The payment of interest on long-term and short-term debt was at 90 and 45 days respectively. The lag on the payment of preferred stock dividends appears from the record to have been 45 days.

Commission may quite reasonably and properly take into account factors which reduce the need [for working capital] as well as those which increase it." *1978 NET Case,* 390 at 51, quoting *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 203 F.2d 494, 498 (3d Cir.1953).

The Company seeks to distinguish the subject adjustment by asserting that "interest on debt and preferred stock dividends are capital, below the line items which have nothing to do with the cost of day-to-day operations for which working capital must be provided." It argues that the Commission erred as a matter of law and that ratepayers have no claim on those funds to support an offset to working capital requirements.

 The Commission does not argue here that capital costs should be reflected in working capital. Rather, it argues that the investors should receive a return only on that portion of working capital actually contributed by investors, and that to accomplish that result it is necessary to offset accrued funds collected from customers in advance of payment. The position of the Commission is supported by the weight of authority, *see, e.g., Pacific Telephone and Telegraph Co. v. Public Utilities Commission,* 62 Cal.2d 634, 662, 44 Cal.Rptr. 1, 19, 401 P.2d 353, 371 (1965); *Washington Utility and Transportation Commission v. Pacific Northwest Bell Telephone Co.,* 39 PUR 4th 126 (Wash. Util. & Trans. Comm'n. 1980); *Pennsylvania Public Utilities Commission v. Metropolitan Edison Corp.,* 28 PUR 4th 555 (Pa. PUC 1979); *Re: Iowa Public Service Co.,* 10 PUR 4th 467 (Iowa State Com. Comm'n. 1975). We find the Commission approach to be a reasonable means of assuring a fair return on working capital supplied by investors. To accept the Company's position would be to exalt form over substance.

IV. *Reduction of Working Capital With Respect to Contractor Retentions.*

The record reflects that the Company typically withholds a portion of payments due contractors on various construction projects until after completion of the particular project. Because these retentions provide CMP with a source of non-investor supplied capital, they are offset against the Company's working capital allowance. CMP does not contest the Commission's discretion to offset such retentions against working capital. It does argue, however, that the $1,002,000 reduction to working capital made by the Commission in this case was not justified or supported by record evidence.

The evidence showed that during the test year CMP had an average balance of contractor retentions of $1,002,000. Except for $20,000, the retentions resulted from two hydro projects which were both completed shortly after the test year ended. The Company claims that because all but $20,000 was in fact paid soon after the end of the test year, the test year retention levels were no longer representative. It is contended that an adjustment for a "known" change is necessary in determining a current offset to working capital.

In support of its position, CMP relies upon *Central Maine Power Company v. Public Utilities Commission,* 153 Me. 228, 236, 136 A.2d 726, 732 (1957), where the Law Court recognized that "[t]he experience of the test year is at best a 'guess' for the future. If we can make the 'guess' more in line with the probability, in the long run we will have benefited both public and Company." Accordingly, CMP argues that the Commission should not limit itself to the Utility's experience during any single year "when such a limitation would produce an inaccurate assessment of [the Company's] true financial situation." *Mars Hill and Blaine Water Co. v. Public Utilities Commission,* Me., 397 A.2d 570, 576 (1979).

 The test year experience, however, should not be rejected except upon a "strong showing of its weakness as a measure for the future." *Central Maine Power,*

153 Me. at 239. As this Court recently noted:

> A basic assumption of the test-year concept is that, over all, the test year is representative of the foreseeable future. The elements that go into the test-year computations of income and expense are not scrutinized individually to determine the degree of likelihood that particular items will recur or disappear or change in the relatively near future. To permit such scrutiny would be to make the test year concept unworkable as a device for prediction of new revenues.

*1982 NET Case,* 448 A.2d at 294.

■ In the present case, in assessing the proper offset to working capital, the Commission relied principally on the testimony of Staff witness Louiselle, who testified as to the propriety of deducting the entire test year amount from the rate base:

> The point is that test year retentions will be superseded by other retentions in the normal course of business. . . . The test year has as its goal the determination of the various components such that the relationships are reasonably indicative of the future. The fact that the dollars associated with a particular component will cease to exist is in part irrelevant if the overall relationships remain in balance or if those dollars are replaced with similar amounts.

Moreover, because the record reflects that CMP's projected construction program assumed significantly increased expenditures, the Commission was warranted in concluding that retained funds remain at the same level.

CMP, in turn, failed to introduce any evidence before the Commission sufficient to establish that the test year experience was *not* indicative of the utility's expected contractor retention balance for the present rate year. Although the retentions associated with two specific hydro projects would no longer be reflected in the Company's balance, CMP did not put forth evidence which could establish the likelihood of known and measurable changes from the overall test year data. The mere fact that the Company paid out a substantial portion of its test year retentions, does not amount to a "strong showing" that that amount will not be replaced by similar levels in the future. The Commission's reduction of working capital by $1,002,000 was reasonable.

## V. Disallowance of the Costs of CMP Television Advertisements.

The Company argues that the Commission acted arbitrarily and capriciously, in violation of its own regulations, in excluding the $67,798 cost of four CMP television advertisements as test year expenses for ratemaking purposes.

The Commission's Regulations (Me.P.U.C. Reg. Ch. 83) establish various categories for advertising and political activities and set forth the ratemaking and accounting treatment for each. Chapter 83 requires that all expenses associated with "institutional" or "promotional" advertising be separately accounted for (§ 3) and states that "no electric or gas utility shall recover from any persons other than its shareholders or other owners for any expenditures, contributions, expenses, or costs of such utility incurred with respect to institutional advertising . . . ." § 5(c).[7] The rule excepts from the general prohibition certain types of institutional advertising, which in relevant part are as follows:

> (1) Inform customers how they can conserve energy, reduce peak demand for a utility's service or otherwise reduce consumption of the utility's service,
>
> (2) Inform customers about energy-efficient appliances, equipment or services, or about practices which reduce the cost of utility service,
>
> . . . . .

---

7. "Institutional advertising" is defined as "any advertising conducted for the purpose of promoting the corporate image or good will of a public utility or the utility industry." Section 1(c).

(4) Concern connection, disconnection, conditions of service, billing procedures, service interruptions, safety measures, or emergency conditions.

Section 1(F).

CMP does not challenge the validity of the regulation, but maintains that the four disputed advertisements fall within the above exceptions. The allowance or disallowance of institutional advertising as a ratemaking expense is inherently a policy decision, and therefore a matter properly within the Commission's discretion. *Cf. 1978 NET Case,* 390 A.2d at 55–6. Whether a particular advertisement falls within one of the established exceptions and should be included in the Company's operating expenses for ratemaking purposes, therefore, becomes a question of fact for the Commission. Again, the Commission's findings of fact are final if supported by substantial evidence in the record. *1982 NET Case,* 448 A.2d at 278.

On review, we find that the Commission could reasonably have concluded that the advertisements in issue are little more than recitals of CMP's internal efforts with respect to safety and conservation programs. It would be reasonable to conclude that the advertisements were not designed to provide the type of consumer information specified in the regulation.

The Company argues that the Commission erred in construing Chapter 83 § 1(F) as being limited in scope to equipment, practices and services in which the *customer* can engage. It maintains that section 1(F) refers to *any* such equipment, practices or services and necessarily encompasses the practices of a utility. The interpretation of regulations by the agency that promulgated them, however, is entitled to great weight and should not be set aside unless clearly erroneous. *See, e.g., Walters v. Petrolane-Northeast Gas Service, Inc.,* Me., 425 A.2d 968, 972–73 (1981). Moreover, if the exceptions of section 1(F) are to make any sense in light of the general prohibition against passing the costs of institutional advertisements through to rate-

payers, it would certainly be reasonable to conclude that they refer only to information, services or equipment that in some way can be expected to have a *direct* benefit to the *ratepayer.* Accordingly, we uphold the disallowance of the costs of these television advertisements for ratemaking purposes.

The entry is:

Section 303 appeal denied.

Judgment for defendant in section 305 complaint.

The Decision and Order and the Supplemental Order of the Commission is affirmed.

GODFREY, VIOLETTE, JJ., and DU-FRESNE, A.R.J., concurring.

NICHOLS and ROBERTS, Justices, concurring in part and dissenting in part.

We respectfully disagree with the Court's disposition of the issue discussed in Part I of the opinion. We are persuaded that the Legislature has not authorized the Commission to implement public policy relating to conservation and cogeneration by the method utilized by the Commission in this case. In the absence of such authority, that method should not be condoned by the Court. In all other respects we concur with the opinion of the Court.

CARTER, Justice, dissenting in part.

I concur in Parts II through V of the Majority Opinion.

I must respectfully dissent, however, from the Court's holding in Part I of the Opinion. The Court upholds the Commission's conclusion that for ratemaking purposes CMP's cost of capital should be fixed at 15.4%. In its Order, the Commission stated:

If it were not for CMP's practices with respect to cogeneration and conservation, we would allow CMP a rate increase designed to provide it with a reasonable opportunity to earn a return of 15.5% on its common equity. However, for the

reasons set forth below, we find that with respect to the promotion of conservation and cogeneration, the company has not operated as efficiently as possible nor has it been utilizing sound management practices. 35 M.R.S.A. § 51. Therefore, we will allow CMP a rate increase designed to provide it with a reasonable opportunity to earn a return of 15.4% on common equity.

PUC Opinion at 15–16. In spite of the majority's disclaimer that it is not necessary to determine whether the Commission may properly so penalize a utility, the actual result achieved by today's decision is that the Commission may properly impose, under the aegis of its ratemaking power, a "penalty" for the utility's "failure to effectuate the public policy expressed in independent state and federal energy legislation." 455 A.2d at 39.

## I.

A close review of the statutory premises of the Commission's ratemaking authority and of the basic goals of that process is necessary for a precise understanding of the scope of that authority. The powers of the Public Utilities Commission "are derived wholly from statute." *Stoddard v. Public Utilities Commission,* 137 Me. 320, 323, 19 A.2d 427, 428 (1941). The statute conferring on the Commission its ratemaking authority clearly focuses on the primacy of the purpose of securing for the utilities of this State those revenues necessary to support their obligation to provide service to the public. That statute provides:

Every public utility is required to furnish safe, reasonable and adequate facilities. The rate, toll or charge, or any joint rate made, exacted, demanded or collected by any public utility for the conveyance or transportation of persons or prop-

erty between points within this State, or for any heat, light, water or power produced, transmitted, delivered or furnished, or for any telephone or telegraph message conveyed, or for any service rendered or to be rendered in connection with any public utility, shall be just and reasonable. In *determining just and reasonable rates,* the commission *shall* provide such revenues to the utility *as may be required to perform its public service and to attract necessary capital on just and reasonable terms.* Every unjust or unreasonable charge for such service is prohibited and declared unlawful. In determining just and reasonable rates, the commission may consider whether the utility is operating as efficiently as possible and is utilizing sound management practices.

35 M.R.S.A. § 51 (1982) (emphasis added).

The statute *obligates*[1] every regulated utility to provide its service at "just and reasonable rates." The statute proscribes as unlawful "[e]very unjust or unreasonable charge" for a utility's service and, finally, mandates that the Commission, in setting just and reasonable rates, "*shall* provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms." 35 M.R.S.A. § 51 (emphasis added). The use of the word "shall" in that grant of authority can not reasonably be read as signifying other than a mandatory duty.

The statute clearly means that in setting "just and reasonable" rates the ultimate standard is the revenue need of the utility in order to assure its ability to provide service to the public. Linking these revenue needs to the ability "to attract necessary capital on just and reasonable terms" reflects the exclusively economic context in

---

1. A utility can not simply cease its business-service activity. It must petition the PUC for authority to reduce or terminate its service. 35 M.R.S.A. § 212. After a determination of a public necessity for the utility's service, it may be required, against its will, to continue to provide that service. *See Application of Casco*

*Castle Co.,* 141 Me. 222, 224, 42 A.2d 43, 44 (1960). Requirement of provision of reasonable and just rates for its service is a necessary concurrent aspect of the utility's obligation to provide its service as long as the Commission finds a public necessity for that service.

which the Legislature contemplated that rates should be determined. Any residual doubt as to the validity of that proposition is conclusively obliterated by the Legislature's prescription of the criteria by which the Commission is to judge that level of rates which are "just and reasonable." The next section of the statute provides:

In determining reasonable and just rates, tolls and charges, the commission shall *fix a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the State and a fair return thereon.* In fixing such reasonable value, the commission shall give due consideration *to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the utility, less depreciation on each, and any other factors or evidence material and relevant thereto,* but such other factors shall not include current value. In making such valuation, the commission may avail itself of any reports, records or other information available to it in the office of any state officer or board.

35 M.R.S.A. § 52 (1982) (emphasis added).

This Court has said that the statute constitutes a legislative election of "an original cost rate base which is the cost of the utility's property when it is first devoted to public use." *Mechanic Falls Water Co. v. Public Utilities Commission,* 381 A.2d 1080, 1095 (Me.1977) (quoted in *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 390 A.2d 8, 30 (Me.1978) (hereinafter *1978 NET Case* ). We have observed that "[r]atemaking in theory is a relatively simple process. To the cost of producing the service furnished is added a reasonable return to the investor." *1978 NET Case,* 390 A.2d at 14. In determining the rates to which the utility is entitled, "the Commission must strike a nice balance between the essential revenue needs of the Company and the value of the service to the rate payer and his ability to pay." *Central Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 278, 109 A.2d 512, 522 (1954). But we must bear in mind that "the

*basis of all calculations* as to the reasonableness of rates to be charged by a public service corporation is the fair value of the property used by it for the convenience of the public." *Kennebec Water District v. City of Waterville,* 97 Me. 185, 202, 54 A. 6, 13 (1902) (emphasis added). And we must especially bear in mind that in acting under section 52,

[T]he Commission not only receives its authority from the Maine statute but is bound by the provisions of the state and federal constitutions which forbid the taking of private property without just compensation.... *[T]he ... Commission is a creature of statute and bound to act in accordance with the statute which created it.*

*New England Telephone and Telegraph Co. v. Public Utilities Commission,* 148 Me. 374, 379, 94 A.2d 801, 804 (1953) (emphasis added) (citations omitted) (hereinafter *1953 NET Case* ).

The statute specifying the ratemaking criteria by which the Commission shall act, while admittedly (and presumably deliberately) permitting wide flexibility of choice by the Commission in the selection of ratemaking *methods,* is explicit concerning the exclusivity of the ultimate *purposes* to be achieved by the Commission in exercising that authority. The specific delineation of discrete purposes of the ratemaking function necessarily imposes a limitation on the range of methods available to the Commission in performing that function. Generally stated, that limitation is that those methods chosen must be reasonably related to the achievement of the purposes of that function; at the very least, methods may not be used that defeat the achievement of those purposes.

The statute states the intended dual purposes of the ratemaking authority: to fix (1) "a reasonable value upon all the property of ... [the] utility used or required to be used in its service to the public within the State" and (2) "a fair return thereon." 35 M.R.S.A. § 52. The statute next states the

criteria which must receive "due consideration" in the ratemaking process: (1) "evidence of the cost of the property when first devoted to public use," (2) "prudent acquisition cost to the utility," (3) deduction for depreciation on those criteria, and (4) "any other factors or evidence *material and relevant thereto....*" 35 M.R.S.A. § 52 (emphasis added). The first three criteria implicitly provide a factual matrix on which the Commission can achieve the statutorily mandated purpose of "fixing" the cost of the utility's property and a fair rate of return on it. The fourth, and "catch-all" criterion contemplates other factors and evidence that are "material and relevant" to those purposes. Thus, all the criteria so specified are exclusively economic in their content.

This Court has emphasized that the "overriding purpose of the entire public utility statute" is to assure that the rates charged to the public by a regulated utility are just and reasonable, *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 376 A.2d 448, 454 (Me.1977), to both the ratepayer and the utility. *See In re Searsport Water Company,* 118 Me. 382, 388, 108 A. 452, 455 (1919). A fair and just rate of return assures the utility's ability to secure capital and to maintain its credit and prevents implementing rates that are "an unreasonable burden on the ratepayers." *1978 NET Case,* 390 A.2d at 30. That statute does not contemplate the achievement of any policy goal by the Commission by the exercise of its ratemaking authority[2] other than the fixing of just and reasonable rates and the avoidance of proscribed confiscation. The absence in sections 51 and 52 of any language concerning the enforcement of other policy goals of the Commission can only be read as representative of a legislative intent that the fixing of "reasonable and just rates," on the basis of the relevant criteria specified by the statute, is the Commission's sole purpose.[3] The Commission's power to fix rates does not properly encompass any judgmental element other than those related to the purposes of assuring the financial integrity of the utility's enterprise and avoiding rates that are burdensome to the public. The requirement of just and reasonable rates, viewed in a strictly economic context and isolated from the achievement of other independent policy goals of the regulatory agency, is a necessary constituent element of a public policy directed toward provision of public service through the utilization of private capital.

The financial integrity of the particular utility, and of the utility industry as a whole, makes possible the effective provision of service to the public by the use of private capital. That financial integrity also provides the sole basis for implementing those policy objectives thought by the Legislature to be properly correlative to the manner in which such service shall be provided. This Court has previously recognized the exclusively economic focus of the Commission's function in fixing rates:

**2.** The authority vested in the Commission to formulate and enforce policy, *separate from the ratemaking function of the Commission,* is conferred by other statutory provisions. For example, the Commission can implement energy conservation techniques and innovations by ordering electric public utilities to submit specific rate design proposals and related programs. 35 M.R.S.A. § 93 (Supp.1982). The Commission can mandate a scheduled phasing-in of improvements in electric utility rate design and order other energy conservation techniques, programs and innovations. 35 M.R.S.A. § 94 (Supp.1982). The Commission may regulate the termination or disconnection of a person's utility service to ensure that the requirements of due process are satisfied. 35 M.R.S.A. § 314 (Supp.1982). The Commission may investigate accidents occurring on the premises of a utility if an investigation will be in the public interest. 35 M.R.S.A. § 141 (1978). The Commission may terminate utility contracts based on rebates, discounts, or discrimination with respect to services. 35 M.R.S.A. § 103 (1978).

**3.** In economic terms, such rates provide a fair and just "return to be allowed on the value of the utility's property devoted to public use." *1978 NET Case,* 390 A.2d at 30; *see In re Searsport Water Company,* 118 Me. at 388, 108 A.2d at 455. A rate so established may be viewed as "the interest rate which the utility earns on its investment in property serving the public." *1978 NET Case,* 390 A.2d at 30.

The making of public utility rates requires four basic determinations:

1. what are the enterprise's gross utility revenues under the rate structure examined;

2. what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues;

3. what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned; and

4. what percentage figure (rate of return) should be applied to the rate base in order to establish the return (wages of capital) to which investors in the utility enterprise are reasonably entitled. *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 291, 43 S.Ct. 544 [547–548], 67 L.Ed. 981 (1923) (Brandeis, J., dissenting).

*1978 NET Case,* 390 A.2d at 14. That statement clearly exemplifies the narrowing of the ratemaking process to its economic ramifications and, in my view, excludes from the process's parameters the consideration of achievement of other independently established policy goals devolving upon the Commission as constituent parts of *its general regulatory function.* The Legislature intended, and reason dictates, that ratemaking under sections 51 and 52 must be an exclusively economically-oriented function.

## II.

The Majority Opinion in this case is, in my view, demonstrably in error and if *stare decisis* is to be a burden to the Court in the future, that error will have profound implications in subsequent cases. The Court errs in its focus by concluding that in reviewing the Commission's determination of cost of equity, the Court looks *only* to the reasonableness of the end result of the Commission's calculations. This focus begs the entire question raised here by the utility. CMP challenges the effective rate as not "just and reasonable," not on the basis of evidentiary insufficiency, but on a specific legal proposition. CMP argues that the effective rate is based on a cost of equity determined through the Commission's error of law. The utility contends that *but for* the error of law—using the ratemaking power to impose a penalty that is beyond the statutory authority of the Commission—the utility would have had an effective rate based on a cost of equity of 15.5% rather than one based on 15.4%. A rate based on a 15.5% cost of equity would have generated an additional half million dollars of revenue for the utility. By the Commission's own decision, that rate, too, would have been "just and reasonable." That rate would have adequately responded to the utility's cost of equity within the Commission's own range of reasonableness for the cost of equity and would not have imposed any unreasonable burden on the ratepayer. Either rate, viewed strictly in terms of evidentiary sufficiency of the Commission's own economic premises and methods and in terms of its explicit finding, would be a "just and reasonable" rate and would assure "a fair rate of return" to the utility.

The utility questions why it cannot benefit from the higher rate for cost of equity, within the range of reasonableness set by the commission, when the lower rate is the product of the application of an erroneous principle of law. The majority opinion provides neither discussion nor resolution of that question. It administers a judicial "back-of-the-hand" to what I think to be an important and telling contention: just and reasonable rates *must* be determined by the application of proper legal principles.

The majority opinion misapplies, in my view, a standard of appellate review, which should be applied and which has historically only been applied to resolve challenges to the sufficiency of the evidence to support the Commission's findings or to the adequacy of such findings to support the Commission's decision. I recognize the validity of, accede to, and am bound by, in such a case, the strictures the Court has previously set on its role in reviewing the factual bases of rates fixed by the Commission:

The Commission is the judge of the facts in rate cases such as this. *This court under the statute which created it is only a court to decide questions of law.* It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the Legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets evidence before it, then the question becomes one of law. *1953 NET Case,* 148 Me. at 377, 94 A.2d at 803 (emphasis added). Deference to the Commission's factfinding role, recognition of its expertise, and review of its factual conclusions as properly made within a wide ambit of discretion, are all perfectly valid appellate principles. These principles validly apply when the issue raised is the sufficiency of the evidence to support Commission findings of fact or the adequacy of those findings of fact to sustain the decision of the Commission in fixing rates. The principles do not validly apply to cut off this Court's inquiry into a contention that the Commission has committed an error of law in fixing a rate. When, in fixing a rate, the Commission "fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution[s] . . . this Court [can] intervene. Then the question becomes one of law." *1953 NET Case,* 148 Me. at 377, 94 A.2d at 803. It is our proper function to intervene and this Court carefully and explicitly reserved the power to do so in the *1953 NET Case,* 148 Me. at 337, 94 A.2d at 803.

The utilities and ratepayers of this State are entitled to the application of correct principles of law in the determination of just and reasonable rates. I can not believe that the public interest is well-served, in so important a matter as the financial ability of utilities to provide public service, by a determination that the fixing of the effective rates, which sustain that ability, are not subject to the limitations of legal principle.

Even when the Commission's discretionary consideration of the evidence supports the results in a rate case, we have "cautioned" the Commission against practices that occasion irrationality through abrogation of its duties:

We caution the Commission that our decision in the case does not constitute approval of a practice of *"splitting the difference"* in general. The Commission has the duty to exercise its expertise and judgment in ratemaking proceedings. It may not abdicate that responsibility by splitting the difference whenever its Staff and a utility disagree. When a legitimate issue is appropriately raised before the Commission it must discharge its responsibility and resolve that issue.

*Casco Bay Lines v. Public Utilities Commission,* 390 A.2d 483, 488–89 (Me.1978). The Commission's duty cannot be less onerous in respect to the application of proper principles of law in its deliberations. Though "ratemaking is an 'inexact science,'" 455 A.2d at 39, it should not be viewed as one devoid of principle.

If this Court will not correct a demonstrable error of law in the fixing of rates, there will be only a narrowly constricted purpose served by the continuance of this Court's appellate function in public utility ratemaking cases. Contrary to express statutory mandate, today's decision allows this Court to identify and correct error only in cases in which chance fails to rescue rates, based on legal error, from the constitutional anathema of "confiscation." 35 M.R.S.A. § 305. Short of that, the Commission's dictates will be inviolate.

### III.

The state statutes stating the *legislative* policy as to cogeneration and conservation,

the Electric Rate Reform Act (ERRA), 35 M.R.S.A. §§ 92–96 (Supp.1982), and the Small Power Production Facilities and Co-generation Facilities Act (SPPFA), 35 M.R. S.A. §§ 2321–2328 (Supp.1982), which the Commission seeks to implement by the rate penalty imposed in this case, do not provide for achievement of those policies by resort to the Commission's general ratemaking authority. For example, the ERRA specifically provides for implementation of those legislative policies articulated in 35 M.R.S.A. § 92 by the Commission's ordering "electric public utilities to submit specific *rate design proposals and related programs* for implementing energy conservation techniques and innovations, either in conjunction with or independently of any ratemaking proceeding pending before the Commission." 35 M.R.S.A. § 93 (Supp.1982). The Commission, therefore, has no authority to achieve the policy goals of ERRA by directly affecting the utility's rate-generated revenue capacities. The statute is specific in limiting the impact of the policy goals of ERRA on effective rates and, therefore, on revenue generation, to the *indirect* effect that results from the theoretical considerations of rate design and related programs.

The second stage of the authorized implementation of those policies under ERRA occurs when the Commission

> shall mandate, after notice and hearing on the proposed schedule, a scheduled phasing-in of the improvements in electric utility rate design and related regulatory programs approved under section 93 and is authorized to order utilities to develop and implement electric utility rate design improvements approved by the Commission....

35 M.R.S.A. § 94 (Supp.1982). But it is especially significant that the statute ex-

pressly protects the revenue requirements of the utility in such rate design undertakings by providing that, "[i]n ordering any rate design improvements, the commission shall consider *and assure* the revenue requirements of the utility." 35 M.R.S.A. § 94 (emphasis added). The Act makes no special provision for enforcement of such orders or mandates nor for imposition of discrete penalties for their nonobservance. It is apparent that the implementation of the policy of the ERRA is fully achieved when a subject utility has complied with such orders and mandates. It is also apparent that the Legislature intended that the Commission be committed to those general enforcement mechanisms, including specific penalty provisions, created for the enforcement of Commission orders generally, when a utility fails or refuses to obey such an order or mandate issued pursuant to section 94.

The SPPFA articulates the legislative policies it is intended to implement in 35 M.R.S.A. § 2322 (Supp.1982).[4] Section 2325 (Supp.1982) authorizes, by way of implementation of those policies, the sale to any public utility, without Commission approval or rate approval, of power by "[a]ny small power producer or cogenerator," as defined in section 2323(1) and (3) (Supp.1982). The Act provides for the rate at which the public utility is to purchase such power from the coproducer or cogenerator to be determined by the agreement of the utility and the coproducer or cogenerator. 35 M.R.S.A. § 2326 (Supp.1982). The Commission has authority to intervene to fix those rates *only in the event* that such a rate agreement can not be reached by those parties. In that event, the Act provides that "the commission shall require *the utility to purchase the power at such rates and under such terms as the commission shall establish*

---

4. The policies are:

> to reduce the State's dependence upon fossil fuels for its energy needs... to diversify energy producing systems and energy sources to ensure an adequate and reliable supply of energy for Maine citizens... the development of small energy production facilities using renewable resources and cogeneration

> facilities... to encourage the development of energy producing systems using renewable resources; particularly abundant, indigenous, renewable resources or resources in close proximity to Maine... to promote the more efficient use of existing energy systems particularly through the cogeneration of power....

*by rule or order.* 35 M.R.S.A. § 2326 (emphasis added).

Clearly, the Commission's authority under the Act is restricted to setting those rates

5. The Commission's contention in this case, that it may combine its policy-achievement powers with its authority to determine "just and reasonable rates" at the expense of the accuracy of the latter process, is directly contrary to a 1980 Opinion of the Attorney General. That opinion considered legal questions concerning the then recently-enacted Small Power Production Facilities Act, 34 M.R.S.A. §§ 2321–28. The policy enforcement of this Act is a part of the basis for the penalty the Commission seeks to impose in this case.

One of the questions answered by the Attorney General was whether, in the event of inability of a small power producer and a regulated utility to agree to a rate for purchase of power, the Commission is "authorized to require the utility to purchase the power from the small power producer." Op.Me.Att'y Gen. 80–48. The Attorney General's qualified affirmative response to that question is significant here for the rationale of the qualification. The Opinion stated:

Despite the specific goals and standards of the Small Power Production Facilities Act, the PUC in establishing utility rates is also required to meet other statutory goals. In specific cases each of the public utility standards of Title 35 might not be in harmony with the others. In such an event, the PUC, in its discretion, subject to court review, might very well decide that one standard should be met but not another. This opinion will attempt to describe how at times the PUC must weigh different standards and how the PUC could legitimately act in a manner which might discourage, at least in the immediate future, energy production from renewable resources.

. . . .

Any rates established under the Small Power Production Facilities Act must be in accordance with 35 M.R.S.A. § 51 which requires that *all* rates be "just and reasonable" to both the regulated utility and to the utility's customers. Just and reasonable rates are "the overriding purpose of the entire public utility statute."

. . . .

Further, in resolving any possible conflict between the standards of the Small Power Production Facilities Act, the PUC at the same time must harmonize the Act with the "overriding" standard of 35 M.R.S.A. § 51, which calls for "just and reasonable rates." Finally, in orchestrating all these various standards, the PUC must also consider not only their possible long term effect (e.g., decreased reliance on fossil fuels) but also their

that are to apply to the transaction between the disagreeing utility and the coproducer or cogenerator.[5] The SPPFA confers upon the Commission no authority whatever to

possible immediate effect (e.g., heavier burdens on consumers).

. . . .

It is axiomatic that "the powers of the Public Utilities Commission are derived wholly from statute" . . . [I]n setting [prices under the Act] the PUC is constrained by the § 51 requirement to establish only rates that are "just and reasonable." *Thus, the price they set cannot result in an unfair burden on consumers, nor can they deny public utilities a fair rate of return on their investment.* [W]hile the PUC can order the utility to enter into a contract, the statute nowhere suggests that the small power producer or cogenerator must accept the PUC designed contract. This is in keeping with the small power producers stated identity as an unregulated utility and the basic contract principles that requires mutual assent to all contract terms. Op.Me.Att'y Gen. 80–48 (footnote and citations omitted) (emphasis added).

I understand that the Opinion is not controlling authority. The Opinion is founded, however, on a statutory analysis that I think to be correct. The analysis recognizes that the Commission's obligation to fix rates that are "just and reasonable" may not be compromised, with a resulting deprivation of the benefit of such rates to affected parties, simply in order to carry out the policy goals of SPPFA. The gist of the Opinion is that a legal precondition to a requirement that a utility purchase power from a small power generator *at rates found by the Commission under SPPFA* is that the rate be determined to be "just and reasonable" in the context of the revenue requirement of the utility and reasonableness of the rate to power consumers. The requirements of §§ 51 and 52 are, therefore, imported into the pertinent section of SPPFA and compliance with those requirements is a mandatory precondition to a utility's coerced purchase of power under the Act. Thus, the policy goals of the Act are clearly subordinated to the entitlement of both the public and the utility to "just and reasonable" rates formulated in accordance with the economic purposes of 35 M.R.S.A. § 51 and of the economic criteria of § 52.

I think it obviously true that the Commission can not denigrate the sanctity of the "just and reasonable" rate requirement of §§ 51 and 52 in setting purchased power rates under SPPFA. When the Commission sets those rates which apply between the utility and its consumers for the sale of its power, the paramount status of the "just and reasonable" rate requirement, based on the criteria specified in § 52, should

affect, in any respect, the utility's rate structure applicable to the public in order to effectuate the policies of that Act, much less to impose a penalty in the form of a reduction of such justly-determined rates. The limitation, inherent in the Act's *grant of authority* to the Commission under section 2325, makes that restriction abundantly clear. The terms of section 2327 of the Act reinforce that restriction by providing that during review of rates paid by a public utility to a small power producer, "the Commission shall follow the standards prescribed in this section as the basis of the commission's decision pertaining *to these rates.*" 35 M.R.S.A. § 2327 (Supp.1982) (emphasis added).

Finally, the Federal Act on which the Commission relies, the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C.A. §§ 2601–2645 (Supp.1982), provides certain standards for utility rate design and function to be adopted by state regulatory commissions or to be rejected by them on specific findings. The Act specifically provides, however, that "[n]othing in this chapter [46] shall *authorize or require* the recovery by any electric utility of revenues, or of a rate of return, in excess of, *or*

*less than,* the amount of revenues or the rate of return determined to be lawful under *any other provision of law.*" 16 U.S. C.A. § 2627(a) (emphasis added). In the face of that provision, it is impossible for the Commission to contend successfully that it derives from that Act *any* power to deprive a utility of a fair rate of return as a penalty for alleged uncooperativeness or even for noncompliance with the Commission's efforts in that respect.

The Commission clearly violated these statutes when it considered, in the exercise of its ratemaking function, its ancillary policy-achievement functions. The policy goals bear no direct relationship, from the perspective of either the utility or its ratepayers, to a determination of the economic needs of the utility or to the reasonableness, *per se,* of the rates in question.

## IV.

The cost of equity is a critical fact in the ultimate determination of the rates lawfully charged by the utility. *See Camden and Rockland Water Co. v. Public Utilities Commission,* 432 A.2d 1284, 1292–93 (Me.1981); *1978 NET Case,* 390 A.2d at 35–38.[6] In

be similarly maintained. One may validly assume that the effect of SPPFA rates for the purchase of power by the utility, if not "just and reasonable," would have a limited and indirect negative impact on both the consumer burden and the utility's revenue requirements, viewed on an overall scale. When the Commission moves to enforce its view on such policy goals by directly affecting the level of rates that the utility can charge for sale of its power on an across-the-board basis, however, the effect is both immediate and unlimited in its impact on the utility's revenue requirements and on the consumer burden imposed by those rates. The potential for negative and damaging effect on both the revenue requirements and the consumer burden is increased tremendously if the Act's independent policy goals for cogeneration become paramount.

Reason requires that if the sanctity of an economic basis for ratemaking is not to be sacrificed in setting SPPFA rates, when the negative effect on revenue requirements and consumer burden will be comparatively miniscule, an economic basis can not be sacrificed in setting "just and reasonable" rates for the general sale by the utility of power to its custom-

ers. The Commission's suggestion to the contrary exemplifies the temerarious quality of its pursuit of a policy goal which can be, at best, of a limited public benefit at the expense of "the overriding purpose" of § 51 in mandating the fixing of "just and reasonable" rates.

6. The "cost of capital" method of computing a fair rate of return requires a determination of what the utility must pay to secure financing from equity and debt investors. "Thus, the appropriate rate of return is based upon what the utility must earn to satisfy its investors." *1978 NET Case,* 390 A.2d at 32. It is also established that "[t]he cost of capital is calculated by determining the cost of different items of capital. A weighted cost for each item is derived by multiplying its cost by its ratio to total capital. The sum of these weighted costs then becomes the rate of return." 390 A.2d at 32. "Capital cost when competently computed is essentially and practically the equivalent of fair rate of return." *Central Maine Power Company v. Public Utilities Commission,* 156 Me. 295, 307, 163 A.2d 762, 769 (1960); *see Mars Hill·& Blaine Water Co. v. Public Utilities Commission,* 397 A.2d 570, 581 (Me.1979). Cost of equity is part of cost of capital.

reviewing a Commission determination of cost of equity, we proceed with great caution because

[t]he determination of the cost of equity is one of the most difficult and complex tasks facing the Commission. The Commission *must* utilize to the fullest its regulatory expertise and skill *to analyze the highly technical economic and financial data* presented on this issue. We cannot and will not attempt to second guess the Commission *on such matters* lying particularly within its area of expertise. *Only when its actions are unreasonable or unsupported by substantial evidence may we intervene.*

*1978 NET Case,* 390 A.2d at 37–38 (citations omitted) (emphasis added).

We will not intervene when only the Commission's selection of an appropriate method of computation is in issue, *Mars Hill & Blaine Water Co. v. Public Utilities Commission,* 397 A.2d 570, 585 (Me.1979), and "that choice is reasonable." *Camden & Rockland Water Co.,* 432 A.2d at 1293. When the sole issue is the reasonableness of the rate of return, we limit our analysis of the cost of equity determination to a dual inquiry: "(1) whether it is reasonable in result and methodology, and (2) whether it is supported by substantial evidence." *Mars Hill & Blaine Water Co.,* 397 A.2d at 584. Such a rule does not require, however, and should not permit, any limitation of the court's review when the issue is whether the selection by the Commission of a specific cost of equity was erroneous *as a matter of law* because the Commission considered in that selection factors outside the scope of its statutorily conferred ratemaking authority. Under such circumstances, the Commission's determination can not stand even if that determination appears reasonable or is supported by substantial evidence.

The utility asserts, here, without contradiction, that the difference of one-tenth of a percentage point between the cost of equity as fixed at 15.4% and a cost of equity of 15.5%, which the Commission stated that it would have set *except for* "CMP's prac-

tices with respect to cogeneration and conservation," will result in the loss of $500,000 in revenue to the utility. Yet that difference occurs not because of any substantiated economic consideration, not by reason of any factor bearing directly or indirectly on the *actual* cost of equity, not because of any element of unfairness to ratepayers, and not because the utility's stance on that policy matter had any adverse effect upon *the utility's then present ability to provide service to the public on an economically-appropriate basis. The record will not support any such findings.* Rather, the difference occurs solely because the Commission sought to coerce the utility into compliance with the Commission's views as to a proper policy in respect to an aspect of cogeneration and conservation.

The only findings attempted by the Commission show: (1) that CMP did not initially accede to the Commission's policy favoring cogeneration by entering into a single contract in respect thereto with Scott Paper Company; (2) that CMP did not agree with the Commission's legal view that it could force CMP to enter such a contract after the Commission had fixed purchase power rates under SPPFA (the Opinion of the Attorney General substantially supports CMP's position, *see* Op.Me.Att'y Gen. 80–48); (3) that some features of the expert testimony before the Commission supported the Commission's policy, and (4) the Commission objected vigorously to CMP's pursuit of its legal position on the subject policies and that particular contract. Even if we assume that the record establishes all of these four points, they fall short of any finding of adverse effect on CMP's ability to provide efficiently power at the lowest feasible cost. In order to invoke the last sentence of section 51, such a finding is necessary.

The Commission states in its opinion that the CMP legal position, in respect to the Scott cogeneration contract, placed Scott

in the position of either petitioning the Commission to force CMP to enter into a contract or to sell its cogenerated elec-

tricity elsewhere, *most likely* out of state. Thus, CMP's Maine customers would be deprived of the benefits of Scott's cogeneration, *i.e.*, reduced dependence on oil-generated electricity.

PUC Opinion at 17 (emphasis added). Close scrutiny of the rest of the pertinent portion of the Opinion and of the record before the Commission, on which the Opinion is supposedly based, demonstrates that the statement is nothing more than a lame attempt to buttress an arbitrary and unsupported conclusion. First, nothing in the record supports any conclusion that whatever dilemma CMP's legal stance occasioned *to Scott* resulted in any negative effect whatever on the ability *of CMP* to produce power at the lowest feasible cost. Second, as the Commission's own equivocal language indicates, *the record* does not justify the conclusion that the "most likely" alternative for Scott was to sell its electricity out of State, resulting in a loss to Maine residents of the benefit of Scott's cogenerated power. Third, nothing in the record permits any quantification of the extent to which CMP's dependence on oil-generated electricity would be reduced by purchase of Scott's power. Fourth, there is no evidence that even if a dependence on oil-generated electricity *was reduced,* such reduction would have any significant economic impact on the cost of power generated for general sale. Further, there is no evidence that such cost would be itself reduced by such reduction in dependence on oil-generated electricity as would be occasioned by the more expeditious acceptance of the contract with Scott.

Finally, as the Commission notes, CMP did, in fact, enter into the Scott contract after the issuance of the January 12, 1982, Advisory Ruling of the Commission. PUC Opinion at 18. Obviously, that occurred between January 12, 1982, and March 27, 1982, the date of the Commission's Opinion. Thus, assuming, *arguendo,* the possibility of a deprivation of the benefit of Scott's power did exist, that possibility ended with CMP's signing the contract and with it any imagined reduction in its dependence on oil-generated electricity. The imposition of the penalty was clearly in conflict with the "overriding purpose" of sections 51 and 52, was unsupported by any basis, and there was no evidentiary connection between the size of the penalty and the offense it purported to address, assuming that such offense was other than purely imaginary.

Further, the absence of any finding concerning the utility's economic performance invalidates, in my view, the Commission's attempt to base the imposition of the penalty on the authority granted the Commission by the last sentence of 35 M.R.S.A. § 51. That sentence states that "[i]n determining just and reasonable rates, the Commission may consider whether the utility is operating as efficiently as possible and is utilizing sound management practices." But the critical part of the Commission's opinion, justifying imposition of the penalty by reducing the cost of equity from 15.5% to 15.4%, states only that "the company has not operated as efficiently as possible nor has it been utilizing sound management practices." PUC Opinion at 16. That sentence in section 51 must be read, I submit, in the context of a proper view of the "overriding purpose," legislatively determined, of the ratemaking authority. As noted, I believe that that authority requires the Commission to make a purely economic judgment in setting effective rates based strictly on the utility's revenue requirements and the reasonableness of the public burden imposed by the effective rates. Consequently, that last sentence can be relevant as an element of the ratemaking decision only in that context. Only when the Commission finds that efficiency of operation and sound management practices have a present and direct positive or negative effect on the financial needs of the utility and, thus, on its present ability to provide power at the lowest feasible economic cost, may the Commission consider such efficiency and practices in arriving at a just and reasonable rate.

Finally, I seriously doubt the Commission's unsupported assumption that "effi-

ciency of operation" and "sound management practices" as used in section 51 must be construed as embracing policies on cogeneration and coproduction while they are still in the process of development and subject to legitimate legal dispute between the Commission and the utility regulated by the Commission. The power to consider policies at such a tentative stage of development as elements of the ratemaking equation is (1) the power to dictate the Commission's line on such policies without consideration to opposing views and (2) the power to abrogate completely the effectiveness of the mechanisms made available under the statutes and by the Commission's own procedures for the assertion of legal challenge to the Commission's line on such policies. I find no support in the statute or in reason for such an anomalous result.

Forcing compliance for the future, in the absence of any determination of present, adverse impact resulting from past failure to adopt the Commission's line on cogeneration and conservation policy, has no conceivable relevance to the computation of the cost of equity. Any reduction of the cost of equity based on factors not bearing a *direct relationship* to actual cost of equity is suspect. The Commission exceeded the scope of its statutory mandate to determine "just and reasonable" rates by "fix[ing] a reasonable value upon all the property of . . . [the] utility used or required to be used in its service to the public within the State and a fair return thereon." 35 M.R.S.A. § 52. The Commission also exceeded the scope of the authority granted by all of the

subject Acts for the purpose of implementing the policies espoused by those Acts. The insertion of this factor into the computation of cost of equity was contrary to the statutory mandate, the underlying purpose of that mandate, and the constitutional principle against unjust confiscation of utility property. The computation was erroneous as a matter of law and we should so hold.

### V.

The utility is statutorily entitled to a fair and just rate of return and is *constitutionally entitled* to a nonconfiscatory rate of return. *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 251, 136 A.2d 726, 740 (1957). Penalties are, by nature, inherently confiscatory. They are levied as a deterrent based on the theory that arbitrary confiscation of property will prevent further utility resistance to Commission-approved goals and policies. As the extent of the confiscation increases, the level of discouragement of even the most reasonable and legitimate resistance to Commission policy increases.

The ratemaking statutes, read in their entirety, contain no provision that authorizes or justifies depriving the utility, by means of a *penalty,* of a rate that is, on the evidence, a reasonable and just rate. I presume that it is precisely for that reason that the Legislature gave the Commission an explicit, independent, and broad grant of regulatory authority over all utilities within its jurisdiction,[7] and provided explicitly for

7. *See* 35 M.R.S.A. § 4 (1978) (Power of Commission "to inquire into the management of the business of all public utilities and . . . [to] keep itself informed as to the manner and method in which each is conducted. . . ."); §§ 5–7 (1978) (Power of Commission to obtain access to information relevant to business and affairs of regulated utilities); § 8 (1978) (Power of Commission to "inquire into any neglect or violation of the laws of the State" by any public utility); § 13–A (Supp.1982) (Regulation of construction of certain electrical transmission lines and generating facilities); § 13–B (Supp.1982) (Regulation of purchase of additional generating capacity by regulated utility); § 14–A (1978) (Regulation of contracts between regulated utility and contractors for facility's construction); §§ 102–04 (1978 & Supp.1982) (Regulation of financial transactions involving interests of a regulated utility); § 104–A (1978) (Regulation of "insider transactions" involving interests of a regulated public utility or "an affiliated interest"); §§ 131–32 (Supp.1982) (Regulation of calculation and imposition of fuel charge by electric utilities); § 141 (1978) (safety and accident regulation); §§ 171–74 (1978) (Regulation of stocks and bonds transactions of regulated utility); §§ 211–12 (Supp. 1982) (Regulation of property transactions involving or abandonment of, property of a regu-

a procedural mechanism by which the Commission's regulatory orders may be enforced when they are met with recalcitrant noncompliance. It may well be that in the exercise *of that authority,* on a proper evidentiary base, the Commission may impose a penalty upon a utility for failure to follow the Commission's plan for achievement of policy goals legitimately committed to its supervision and enforcement. The ratemaking statute makes it clear, however, that such penalties may not be imposed through a reduction in the constituent elements of a just and reasonable rate, thus depriving the utility of a fair rate of return and undermining its continuing ability to attract capital and to provide its public service. Such a telling and devious mechanism of policy enforcement not only offends constitutional principle but must necessarily embody an unacceptable risk of permanently jeopardizing the utility's long-term ability to provide such service.

By using such penalties, the Commission can arbitrarily stamp out all resistance to its policy views. No utility, no matter how justifiable its resistive position, nor viable its financial position, can long stand against a determined Commission effectively wielding the broad axe of revenue confiscation. Considering the language used in defining the Commission's ratemaking function, it is manifest to me that the Legislature did not intend to clothe the Commission with such an unfair dynamic as an impetus to policy acceptance through economic coercion of those utilities *obligated* by the Legislature to provide service to the public. If that evil is the result of today's decision, I fear that the ability of the utility industry "to attract necessary capital on just and reasonable terms," 35 M.R.S.A. § 51, has been done irreparable damage. Investors may well fear that the only security for obtaining a fair rate of return on utility investments lies in the utilities' total and unquestioning compliance with the Commission's policy views.

So broad a grant of such irresistible authority is, in context, not only unwarranted but must be destructive of the Commission's proper role. Its exercise will immediately corrupt the ratemaking process and I am certain that it will, in the long-term, corrupt the Commission's ability to perform its proper function as an aggressive but dispassionate mediator between the demands of capital and the needs of the public.

I would reverse the Commission's order and remand this case to the Commission with instructions to order the approval of effective rates based on a cost of equity to the utility of 15.5%.[8]

lated utility); § 2533 (1978) (Regulation of activities of natural gas pipeline companies within the State); § 2809 (1978) (Regulation of rural electric cooperatives); §§ 3321–22 (1978) (Regulation of use and installation of radar devices on vessels and regulated carriers).

None of this considerable body of statutory law, which confers broad regulatory powers on the Commission, provides any authority for the Commission to accomplish any purpose within its expansive regulatory authority by imposing penalties in the determination of just and reasonable rates, under its *ratemaking* authority. Similarly, even in those sections of the Act expressly authorizing the imposition of penalties by the Commission, 35 M.R.S.A. §§ 351–60 (1978), there is no suggestion that penalties may be imposed through the use of the ratemaking authority. Thus, any authority to impose penalties by the exercise of the ratemaking authority, if any exists, must be found in the language of the statutes that confer on the Commission the ratemaking authority, 35 M.R.S.A. §§ 51–72 (1978 & Supp.1982). Such language can not be found in those statutes.

8. The Commission has determined that, on the *economic facts* presented to it, a fair rate of return should be based on a cost of equity of 15.5%. By conventional learning, we presume that such a conclusion is the product of the Commission's special expertise and we accord that conclusion a presumption of propriety, regularity, and fairness. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287–288, 88 L.Ed. 333, 345 (1944); *1978 NET Case,* 390 A.2d at 30. I suggest that we must treat the Commission's determination of cost of equity at 15.5% as a fact found on a proper evidentiary base and accord to that determination the full force that it deserves as the product of the Commission's *legitimate* expertise.